Winthrop J. ALLEGAERT, as Trustee of duPont Walston Incorporated, Plaintiff,

v.

H. Ross PEROT et al., Defendants.

No. 75 Civ. 3214.

United States District Court, S. D. New York.

May 17, 1977.
Supplemental Memorandum and Order June 1, 1977.

As Amended June 8, 1977.

Hughes, Hubbard & Reed, New York City, for plaintiff, by Robert J. Sisk, George A. Davidson, Karen G. Lind, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for H. Ross Perot, by Peter Gruenberger, Henry J. Tashman, Irwin H. Warren, New York City, of counsel.

Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D. C., for H. Ross Perot, EDS, duPont Glore Forgall, by Richard P. Shlakman, Washington, D. C., of counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Plaintiff, the trustee in bankruptcy of duPont Walston, Inc. (Walston), has moved pursuant to Canon 4 to disentitle several of the defendants in this action from the continued services of their attorneys on the ground that such attorneys formerly represented Walston on matters substantially related to the instant action.[a]

The Trustee seeks an order disqualifying the firm of Weil, Gotshal, and Manges ("Weil Gotshal") from, representing defendants H. Ross Perot ("Perot"), Milledge A. Hart, III ("Hart"), Morton H. Myerson ("Myerson"), PHM & Co. ("PHM") and duPont Glore Forgan Inc., and it seeks an order disqualifying the firm of Leva Hawes, Symington, Martin & Oppenheimer ("Leva Hawes") from representing Electronic Data Systems Corp. ("Electronic") and E.D. Systems Corp. ("E.D. Systems"). The trustee alleges that Weil Gotshal and Leva Hawes represented Walston on matters substantially related to this lawsuit and that both firms now threaten to use to the trustee's disadvantage confidential infor-

mation acquired in the course of such representation. In order to evaluate this allegation, we turn first to the substance and background of the complaint in this action.

### The Complaint

This action arises out of the bankruptcy of Walston, one of the largest Wall Street brokerage firms, following its entry into a series of agreements with duPont Glore Forgan ("DGF Inc."), another large Wall Street brokerage firm, pursuant to which the two companies, while maintaining their separate identities realigned into a combined operation. Pursuant to these agreements Walston undertook to carry out all front office operations including the operation of a branch office system and DGF Inc. undertook to carry out all back office operations including the maintaining and processing of individual customer's accounts, the clearing of securities, and the accounting.

The trustee alleges the following in connection with this realignment as the basis for his twenty-four claims charging violations of the Securities and Bankruptcy Acts. We here express no view as to the validity of any of these allegations.

Prior to the realignment DGF Inc. was on the verge of liquidation. This jeopardized Perot's considerable investment in DGF Inc., which he controlled, and in turn jeopardized Perot's investment in Electronic and in E.D. Systems, its wholly owned subsidiary, since Electronic held a lucrative computer services contract with DGF Inc. The realignment agreements obligated Walston—in return for inadequate or no consideration—to assume certain of DGF Inc.'s liabilities, to assume responsibility for its losses, and to pay certain of its expenses. In addition, the realignment agreements entitled DGF Inc. to share in the profits at no risk or loss and gave Perot voting control of Walston without his having to pay

a. The trustee also moved to disqualify these attorneys on the ground that members of their

law firms might be called as witnesses. He has since withdrawn this portion of the motion.

for it.[1] Specifically, the agreements obligated Walston, among other things, to take over the failing branch offices of DGF Inc., to pay it a sum in excess of market value for certain fixed assets in these offices, and to assume their lease liabilities even though many of these branch offices were already closed or would have soon to be closed. Perot and persons and companies controlled by him ("the Perot interests") drafted these realignment agreements and railroaded them through the Walston Board of Directors. They gave the Walston Directors insufficient time prior to the Board meeting of July 1, 1973 to analyze these lengthy and complex agreements, and at that meeting made numerous misrepresentations and omissions of material information to induce approval.

Finally, the trustee alleges that the Perot interests drafted the realignment agreements and induced their approval in order to save Perot's investment in DGF Inc., Electronic and E.D. Systems by fraudulently foisting DGF Inc.'s liabilities on Walston and draining Walston of its assets. The trustee asserts that the acts leading up to and following the implementation of the realignment agreements amount to fraud, breach of fiduciary duty and fraudulent and preferential transfers of Walston property.

*The Role of the Law Firms*

By way of background, it is undisputed that for many years prior to the realignment Weil Gotshal represented DGF Inc. and Perot, its clients here, and Leva Hawes represented Electronic and E.D. Systems, also its clients here. On occasion Leva Hawes also represented DGF Inc. Weil Gotshal was involved in every aspect of the birth in 1971 of DGF, Inc., and thereafter it continued to act with Leva Hawes as DGF Inc.'s counsel on a broad range of matters. It is further undisputed that neither firm represented Walston prior to or during the period of negotiating the terms of the rea-

lignment agreements which were approved in July, 1973. Weil Gotshal in conjunction with Leva Hawes represented DGF Inc. in drafting and negotiating these agreements, and Leva Hawes also represented Electronic and E.D. Systems in connection with the same. (Gruenberger Aff. ¶ 18; Shlakman Aff. ¶ 13) Leva Hawes had, prior to this lawsuit, served as counsel to Electronic and to E.D. Systems in a broad range of matters for over a decade.[2] It is also undisputed that after the realignment Weil Gotshal continued to represent DGF Inc. and Leva Hawes continued to represent Electronic and E.D. Systems.

The trustee alleges that *after* the realignment Weil Gotshal and Leva Hawes represented Walston on matters substantially related to this lawsuit. Specifically, the trustee alleges that after the realignment Weil Gotshal and Leva Hawes represented Walston in connection with a derivative action filed by Nella Walston, which action is concededly substantially similar to this one. *Nella Walston v. duPont Glore Forgan Inc., et al.* (Index No. 625/74 Sup.Ct.N.Y.Cty. 1974). The trustee's basis for this assertion is that Weil Gotshal and Leva Hawes billed Walston for services rendered in connection with the *Nella Walston* action and, in addition, Leva Hawes was on "retainer" to Walston during the period that action was initiated. In addition, the trustee alleges that these firms represented Walston on a broad range of other matters of which some, he contends, are substantially related to this lawsuit. He further contends that these firms must have gained general confidential information substantially related to this lawsuit from their alleged representation of Walston on a broad range of matters.

Weil Gotshal and Leva Hawes assert that the services they performed for Walston after the realignment were in no way substantially related to this lawsuit. Leva Hawes claims that its "retainer" was a fee

---

1. There is no allegation in the complaint that Perot used this control to change the Walston Board of Directors.

2. For example, in addition to the preparation of the realignment agreements noted above, Leva Hawes represented Electronic in the preparation of a 1972 contract with Walston which the trustee alleges is involved in this case.

arrangement and that it was not Walston's general counsel.[3]

Both firms agree with the trustee that the derivative action filed by Nella Walston against Walston and many of the defendants here is substantially similar to this action. However, they claim that Shearman and Sterling, not they, represented Walston in the initial stages of that action, and that at all times Weil Gotshal represented DGF Inc. and Perot and Leva Hawes represented Electronic and E.D. Systems in connection with that action. They contend that they billed Walston for services rendered to DGF Inc., Electronic and E.D. Systems in connection with the *Nella Walston* action because the realignment agreements specifically provided that Walston would reimburse the latter for their legal expenses.

At oral argument all agreed that the facts are not in dispute and that the court is in a position to decide the motion on the basis of inferences to be drawn from the facts before it. Turning to the *Nella Walston* case first, the following facts, unless otherwise noted, are not in dispute. From 1966 until 1974 when Walston filed for bankruptcy Shearman and Sterling was general counsel to Walston. Shearman and Sterling had represented Walston in connection with the negotiation of the realignment agreements. (Affidavit of Thomas L. Higginson of Shearman and Sterling) At the July, 1973 Board meeting attorneys from Shearman and Sterling were present on behalf of Walston and attorneys from Weil Gotshal and Leva Hawes were present on behalf of their longstanding clients DGF Inc. and Electronic. At oral argument it was stated that each of these firms attended the Board meeting on behalf of their respective clients because it was obvious to anyone that a lawsuit might well result from approval of the realignment agreements to which substantial stockholders such as Mrs. Walston violently objected.

In December, 1973 Mrs. Walston's counsel sent a draft of a complaint to Shearman and Sterling, who then showed it to Weil Gotshal. On December 19, 1973 Mrs. Walston's counsel met with Mr. Higginson of Shearman and Sterling and Mr. Gruenberger and Mr. Lang of Weil Gotshal and discussed this contemplated lawsuit. On January 10, 1974 counsel for Mrs. Walston wrote Mr. Lang of Weil Gotshal that he had been instructed to file the complaint the next day unless the defendants made a bona fide proposal for settlement. Mrs. Walston's counsel did not send this letter or a copy to Shearman and Sterling. However, Mr. Lang of Weil Gotshal forwarded a copy to Mr. Higginson at Shearman and Sterling. One of Mr. Higginson's partners then wrote Mrs. Walston's counsel a letter in which he stated:

> "We confirm the information we gave you over the telephone that we are authorized on behalf of our client, duPont Walston Incorporated, to accept service of process of a summons and a complaint of which you have previously furnished us a draft copy." (Higginson Affidavit, Exhibit B)

Upon receiving the summons and complaint and acknowledging service of process on behalf of Walston, the same Shearman and Sterling partner wrote:

> "Please note this is merely an acceptance of service of process and that it does not constitute an appearance by us in the action as attorneys for defendant duPont Walston Incorporated. We have not yet

---

**3.** Without in any way denigrating the position taken by the defendants, we simply note that we find it largely irrelevant to the disposition of this motion. As subsequently developed (see "discussion", *infra* pp. 19 et seq.) the crucial fact is that any information acquired by these law firms was acquired under circumstances which absolutely preclude the possibility that anyone connected with Walston (whether stockholder, director, officer, employee or creditor) could possibly have supposed that either firm was undertaking—as against its own primary clients—to keep secret any information it might acquire in the course of work performed for Walston. There having been no expectation of confidentiality with respect to these clients, Canon 4 is inapplicable, and it becomes wholly immaterial whether or not such work was related to this lawsuit, substantially or otherwise. However we shall continue to set forth the contentions of the several parties.

been retained to be the attorneys of record for that defendant." (Higginson Affidavit, Exhibit C)

He then wrote the Clerk of the Supreme Court, New York County, Special Term, Part II requesting the Clerk to notify Shearman and Sterling on behalf of Walston and Weil Gotshal on behalf of DGF Inc. should Mrs. Walston seek any *ex parte* relief before the defendants' time to appear or answer had expired. (Higginson Affidavit, Exhibit D) Mr. Higginson states in his affidavit that Weil Gotshal had authorized Shearman and Sterling to request such notification.

Thereafter, in late January, 1974 Walston retained McHugh, Heckman, Smith and Leonard ("McHugh Heckman") to represent it in the *Nella Walston* action.[4]

Mr. Higginson of Shearman and Sterling avers in his affidavit that during December, 1973 and January, 1974 Shearman and Sterling, not Weil Gotshal or Leva Hawes, represented Walston. Shearman and Sterling does not represent any party to this lawsuit. In addition, Mr. Gruenberger of Weil Gotshal and Mr. Shlakman of Leva Hawes aver in their respective affidavits that neither firm represented Walston in connection with the *Nella Walston* suit before or after it was filed. They aver that Weil Gotshal represented DGF, Inc. and Leva Hawes represented Electronic and E.D. Systems in connection with that action. The trustee contends that "Mr. Higginson . . is not in a position to know whether and to what extent the management at Walston consulted with other counsel". The trustee also contests the latter two averments as interested and points to the bills Weil Gotshal and Leva Hawes submitted to Walston.

*Billing*

Weil Gotshal billed Walston for services rendered in December, 1973 and in January, 1974 in connection with the *Nella Walston* action. (Notice of Motion, Exhibit A, Bills of January 23 and February 4, 1974) These bills state in pertinent part:

"To professional services rendered in connection with the duPont Glore Forgan Incorporated-Walston Business Combination for the month of (December 1973 and January, 1974), *Nella Walston v. duPont Walston Inc., et al.*"

The realignment agreement which pertains to payment of legal services provides in ¶ 6(a) that an "adjusting charge" should be computed for each month in an amount equal to the DGF Inc. expenses for the period plus and minus other sums pertaining to DGF Inc.[5] (Gruenberger Affidavit, Exhibit I)

The trustee points out that these bills pertaining to services rendered in December and January in connection with the *Nella Walston* action do not specifically state that the services were rendered on behalf of DGF Inc. He claims they cannot therefore be identified as having been performed for DGF Inc. for purposes of calculating the adjustment provided for in the realignment agreement. Mr. Gruenberger of Weil Gotshal notes, however, that the bills for services rendered in December, 1973 and January, 1974 "expressly reflect the fact that the billing was in connection with the realignment or 'Business Combination'."

Finally, Mr. Gruenberger avers that:

"Our client, DGF Inc., with the knowledge and consent of George Thomson, Walston's chief financial officer, directed us to bill Walston for services provided to DGF Inc. relating to the *Nella. A. Walston* suit. Our two bills to Walston cover work for DGF Inc. in the *Nella Walston* suit."

He further avers that:

"After February 1974, the mechanics of billing were modified and bills were sent to DGF Inc. for our representation in the *Nella A. Walston* case of DGF Inc. Walston, in turn, was charged by DGF Inc. under the . . . Agreement . . . ."

---

4. Mr. Higginson states this was upon his firm's recommendation.

5. ¶ 6b(c) provides that these expenses include legal expenses.

The trustee avers that Mr. Gruenberger had told him that Weil Gotshal had submitted bills to DGF Inc. as well as to Walston "during the months in question." It is not clear to us what inferences the trustee wishes us to draw from this ambiguous statement. If the months in question refer to December, 1973 and January, 1974, the trustee has not shown us any bills submitted to DGF Inc. during these or any other months and therefore has not supported any adverse inference.

Leva Hawes admits billing Walston for approximately ten hours its attorney spent in connection with the *Nella Walston* case as follows:

"(i) responding to certain telephone inquiries from representatives of the Securities and Exchange Commission concerning the *Nella A. Walston* case, which inquiries were generated by newspaper articles concerning the filing of the suit; (ii) reviewing such newspaper articles; (iii) reading a draft of a proposed complaint in the case which had been furnished to LHSM&O in mid-December, 1974 either directly by Mrs. Walston's counsel or by Weil, Gotshal & Manges; (iv) discussing with Weil, Gotshal & Manges a meeting held at its office with other defendants' counsel who would potentially be involved in the case with Mrs. Walston's counsel before the complaint in the action was filed; and (v) discussing by telephone with Weil, Gotshal & Manges the question of selection of counsel for the Walston directors who apparently were going to be sued by Mrs. Walston." (Shlakman Affidavit ¶ 11)

Leva Hawes contends that it never *represented* Walston in the *Nella Walston* action before or after it was filed. Mr. Shlakman of Leva Hawes avers that his firm billed Walston for these time charges at the direction of Walston's officers with responsibility for approving legal fees, and that after the case was filed Leva Hawes formally entered its appearance for Electronic.

*Other Work*

*Weil Gotshal*

After the realignment Weil Gotshal billed Walston for $145,000 in legal services.

Most of this was related to advice as to investment banking, real estate, employee fringe benefit plans, pending litigation involving customer accounts, antitrust claims involving another brokerage firm, and tax matters. (Gruenberger Affidavit ¶¶ 22 and 23) Much of this related to the customer accounts and employees formerly belonging to DGF Inc. The trustee does not contend that any of this is substantially related to this lawsuit. He does, however, contend that the following four areas of legal services billed to Walston by Weil Gotshal are substantially related to this suit: (1) those rendered in connection with closing and selling the Walston branch offices which were formerly owned by DGF Inc., (2) preparation of amendments to the realignment agreements, (3) research on the possible liquidation of Walston, and (4) reviewing minutes of the Walston Board of Directors.

Weil Gotshal has not specifically identified which of the above were rendered on behalf of Walston, although it has conceded that some were rendered on Walston's behalf:

"In each case our bill was sent to Walston either because we were representing DGF Inc. and were following the arrangement described . . . above with the approval of Walston; or we were representing Walston . . ." (Gruenberger Affidavit ¶ 22)

We shall assume for purposes of this motion that unless specifically attested to as having been rendered on behalf of another entity, these were rendered on behalf of Walston. Weil Gotshal's position, in any event, is that none of the above is substantially related to this lawsuit.

Weil Gotshal admits that it billed Walston for work in connection with the sale of the Walston branch offices in that it rendered services in connection with the consequent transfer of the DGF Inc. customer accounts. However Mr. Gruenberger of Weil Gotshal and Mr. Higginson of Shearman and Sterling attest that Weil Gotshal represented DGF Inc., not Walston, in con-

nection with the above. Mr. Higginson attests:

"The sale of Walston's branch offices during the period from January through March 1974 involved (a) the sale or other transfer by Walston, to the purchasing brokerage firms, of the office premises and the related improvements, furniture, fixtures and equipment and (b) the transfer by duPont, to such brokerage firms of the securities, cash and accounts of the customers to those Walston offices. In all such transactions in which outside counsel were involved my firm acted as counsel for Walston and Weil, Gotshal acted as counsel for DGF Inc." (Higginson Aff. ¶ 11)

Mr. Gruenberger attests to the same. In addition he states: Naturally we discussed these matters with Walston's lawyers and management—DGF Inc.'s and Walston's parts in these transactions of necessity had to be correlated and timed simultaneously." (Gruenberger Affidavit ¶ 19)

In addition Weil Gotshal claims that the transfer of Walston's branch offices is not substantially related to any of the claims in this lawsuit, even those relating to fraudulent transfers because "none of the sales of offices or transfer of accounts entailed any transfer to DGF Inc. or Perot or any other defendant." The trustee admits that none of the defendants named in this suit received a transfer directly. He contends, however, that Electronic was the indirect recipient of a fraudulent transfer because its wholly owned subsidiary, Wall Street Leasing ("WSL") allegedly received a fraudulent transfer arising out of the sale of the branch offices. The trustee alleges in his reply affidavit that Walston files show that WSL received $259,000 for the sale of furniture and equipment contained in the branch offices which WSL had owned. The trustee believes this amount exceeds the fair market value of the furniture and equipment. (Reply Affidavit ¶ 12) Although no paragraph of the complaint

specifically refers to this transfer or to WSL, paragraph 116 states that "Plaintiff is unable to specify each such (fraudulent) transfer or obligation because the relevant records are in the hands of the Perot interests and plaintiff has been denied adequate access to them." As noted above, however, the information regarding the WSL receipts were in Walston's files.

Weil Gotshal admits that on January 23, 1974 it billed Walston $4,862.50 under the heading "General" for work in connection with "preparation of amendments to realignment agreements, . . . and legal research on UCC Article 9 and possible liquidation of Walston." (Gruenberger Affidavit ¶ 22(e)(i)) [6] Weil Gotshal has not explained what these amendments entailed. The trustee contends that the research on the possible liquidation of Walston is substantially related to this suit because the date of Walston's bankruptcy is critical to establishing the Bankruptcy Act claims involving fraudulent transfers.

Weil Gotshal admits it billed Walston on October 2, 1973 in the amount of $464 in part for "review of Board of Directors minutes (insofar as they dealt with DGF Inc.)" (Gruenberger Affidavit ¶ 22(a)) On January 24, 1974 it billed Walston $5775.70 in part for "work on proxy materials and annual meeting, (and) review of Board of Directors minutes (as above)". (Gruenberger Affidavit ¶ 22(f))

*Leva Hawes*

After the realignment Leva Hawes billed Walston for $34,536 in legal fees for the eight month period before Walston filed a petition under the Bankruptcy Act. Leva Hawes admits that it was on "retainer" during that period. The trustee alleges that this was a "general retainer", i. e. that Leva Hawes acted as Walston's general counsel. Mr. Shlakman of Leva Hawes attests in opposition to this assertion that this retainer was only a fee arrangement and

---

6. We note that this is the same bill in which Weil Gotshal billed Walston for services rendered in the *Nella Walston* case. Like the *Nella Walston* billing, the "General" billing is listed under the heading "professional services rendered in connection with the . . . Business Combination."

that "following the realignment Shearman and Sterling continued to act as general counsel to Walston . . ." (Shlakman Affidavit ¶¶ 6 & 7).[7] Mr. Shlakman provides in his affidavit a detailed list of all work for which his firm billed Walston.[8] In his affidavit he states that unless specifically noted otherwise, the work was performed on Walston's behalf. (Shlakman Affidavit ¶ 14) Of this list the trustee singles out the following areas in addition to the billing on the *Nella Walston* case as substantially related to this action: (1) the organization of Walston's in-house legal department, (2) work in connection with the sale of Walston's branch offices, and (3) review of the Walston Board minutes of July 1–2, 1973 at which the realignment agreements were approved.

Mr. Shlakman summarized his firm's work in connection with organizing the Walston legal department in a letter he wrote the trustee's counsel in connection with this motion, which letter he has included in his affidavit. This letter reads in pertinent part:

"The overwhelming majority of time that we billed to Walston was in connection with services relating to the organization and procedures for Walston's Legal and Compliance Department. We spent a substantial amount of time assisting Walston in the drafting of a new compliance manual, reviewing the procedures for the selection, setting of fee arrangements and payment to local counsel to be retained by Walston around the country,

and in interviewing people who were contemplated to be selected as the head of Walston's Legal and Compliance Department following Mr. Cabbel's departure."

Mr. Shlakman admits his firm represented Walston in the above but contends that this is not substantially related to this lawsuit.

Mr. Shlakman admits that his firm "reviewed" drafts of the minutes of the July 1–2, 1973 Walston Board meeting and that this meeting is substantially related to this lawsuit. However, he attests that this was done on behalf of his clients Electronic and E.D. Systems, and not on Walston's behalf. At oral argument Mr. Shlakman stated that Shearman and Sterling, Walston's general counsel, provided Leva Hawes with a draft of these Board minutes "as a courtesy". He stated that any comments he made would be "suggestions" on behalf of Electronic and E.D. Systems and that it was up to Shearman and Sterling, as Walston's counsel, whether such "suggestions" would be incorporated into the final draft of the minutes. It was not brought out at oral argument whether Leva Hawes had in fact suggested any corrections, and if so, whether these had been incorporated.

Finally, as for the work it performed in connection with the sale of the branch offices, Leva Hawes also contends that it represented DGF Inc., not Walston. Mr. Shlakman attests that at the request of DGF Inc. it met with staff and Commissioners of the SEC with respect to "the arrangements being made by DGF Inc. for

---

**7.** He attests in full as follows:

"LHSM&O only represented Walston in connection with matters as to which it was specifically requested to provide legal services by Walston personnel. LHSM&O was not, in any way, outside General Counsel for Walston. Our statements to Walston refer to payment of a "retainer," but the fact that we were paid in advance for a portion of our time charges does not have any bearing on the scope of the services we rendered or the nature of our retention. It has been LHSM&O's policy for many years, including during the brief period when it rendered legal services to Walston, to bill its clients for the time charges of its lawyers, at a significantly lower rate, if the client has paid for a portion of the anticipated services to be rendered on

a regular basis and in advance of the services being performed. Walston agreed to pay LHSM&O such a "retainer" to get the advantage of these lower time charge rates." (Shlakman Affidavit ¶ 7, fn.)

**8.** This list, as summarized by Leva Hawes, includes advice with respect to organizing Walston's legal department and also advice as to "approximately ten different investment banking 'deals,' customer lawsuits and regulatory proceedings, . . . certain limited aspects of its relationship with employees, such as pension plan matters, the contract form used by account executive trainees, and its legal rights when another firm 'raids' its offices." (Shlakman Affidavit ¶ 14)

the full protection of the . . . customer accounts it carried pursuant to the Realignment agreement." (Shlakman Affidavit ¶ 14(*o*)) In addition, Leva Hawes, like Weil Gotshal, contends that these transactions are not substantially related to this lawsuit.

### Discussion

Canon 4 of the Code of Professional Responsibility provides "A lawyer should preserve the confidences and secrets of a client."[9]

■ We note at the outset that this Circuit has repeatedly stated all that need be shown to disqualify an attorney pursuant to Canon 4 is that the attorney has accepted employment adverse to the interests of a former client on a matter that is substantially related to the litigation in question. Once such has been shown, the Circuit has held, the court need not inquire whether the attorney in fact received confidential information. Such will be "presumed". This principle was enunciated by Judge Weinfeld in *T. C. Theatre Corp. v. Warner Bros. Pictures* (S.D.N.Y.1953) 113 F.Supp. 265, 269. It has many times been reaffirmed, see e. g. *Emle Industries Inc. v. Patentex* (2d Cir. 1973) 478 F.2d 562, 570. All counsel have argued the present motion with the above stated test in mind and have exhaustively discussed the question whether or not various work performed by these attorneys was or was not performed for Walston and was or was not substantially related to this

lawsuit. Although we find persuasive the arguments of Weil Gotshal and Leva Hawes that they did not represent Walston on the *Nella Walston* matter and that the several discreet matters on which they did represent Walston are not substantially related to this lawsuit, we do not rule on that basis.

■ It must be remembered that the above enunciated test was devised to implement Canon 4, which requires attorneys to guard the "confidences" and "secrets" of their clients. It follows that where a former client seeks to disqualify an attorney from representing an opponent in ongoing litigation it must be shown that the attorney had been in a position where he could have received information which the former client might reasonably have assumed the attorney would have withheld (i. e. kept secret) from the particular person who is now the opponent.[10] The test is therefore inapplicable where—as here—the facts before us establish that to whatever extent these law firms may have represented Walston, at no time did the defendants, DGF Inc., Perot, Hart, Myerson, PHM, Electronic and E.D. Systems[11] allow their lawyers to put themselves (and at no time did their lawyers inadvertently put themselves) in a position where Walston or anyone connected with that corporation (whether stockholder, director, officer, employee or creditor) could possibly have supposed that these lawyers were accepting confidences which they would withhold (or would by law be

---

9. The Disciplinary Rules pertaining to Canon 4 provide in pertinent part:

    "Disciplinary Rules
    DR 4–101 Preservation of Confidences and Secrets of a Client. (A) 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

10. The statement appearing in several opinions to the effect that "the court need not, indeed cannot, inquire whether the lawyer did, in fact, receive confidential information . . .

which might be used to the client's disadvantage" see e. g. *Hull v. Celanese* (2d Cir. 1975) 513 F.2d 568, 571–572, necessarily assumes that the lawyer had been in a position where he could have received information which the client might reasonably have expected would be held in confidence from the particular person who the attorney is seeking to represent.

11. The defendant PHM is a partnership formed by Perot, Hart, Myerson and one other which holds their investments in DGF Inc. and allegedly participates in managing DGF Inc. The complaint further alleges that at all times material to this action Perot controlled Hart and Myerson and therefore controlled PHM.

entitled to withhold) from their above-named primary clients.[12]

Briefly to recapitulate, in 1973 when the "realignment" giving rise to this litigation was first envisaged Walston, on the one hand, and DGF Inc. on the other were two wholly independent corporate enterprises each represented by its own attorneys. They were, however, faced with a common crisis which threatened each of them with disaster.[12a] Represented by their separate attorneys they negotiated a joint venture pursuant to which, with each keeping its own corporate identity, they would work together. Acutely aware that these emergency measures might fail in their intended effect of averting disaster and that upon such failure litigation would ensue, each entity was at every step advised by its own attorney. The danger (both of ultimate failure and of litigation) of course continued after the "realignment" had been negotiated, and all entities continued seeking advice from their attorneys at each step of the implementation of the agreement. It is therefore inconceivable that Walston or anyone connected with it should for a moment have supposed that these attorneys were undertaking to (or that they were legally entitled to) withhold from their clients any information that they might acquire in the course of any activity undertaken on behalf of the joint enterprise or any of its members. It inexorably follows that whatever information Walston may have imparted to those attorneys was not intended to be kept in confidential from these particular clients which defendants then and now represented. Therefore, Canon 4 is here without application.[13]

This conclusion stands out in boldest relief in connection with the *Nella Walston* lawsuit. The background of this suit was Mrs. Walston's open hostility to the duPont-Walston "realignment", and the certainty of all parties concerned with such realignment that they faced a lawsuit if they went ahead with it. In light of such certainty each individual or entity concerned—including the clients of these two law firms—was represented by counsel at every stage of the proceedings leading up to (and following) final consummation. It was for the open and avowed purpose of protecting their respective clients that these two law firms attended meetings (among others that of Walston's Board of Directors) and reviewed proposed corporate minutes, etc. After the expected lawsuit by Mrs. Walston in fact materialized, counsel for the named defendants (which then included Walston and DGF Inc.) acted as sensible counsel for multiple defendants always do—they sought to minimize grief and expense by acting for each other whenever feasible. In such circumstances it borders on the absurd to suggest that—regardless of by whom, how or why fees may have been paid—anyone connected with Walston should have assumed that either of these law firms had undertaken to conceal from their own clients any information acquired in the course of this joint enterprise.

This conclusion is less dramatically obvious with respect to the trustee's other claims but, on analysis, it is no less inevitable. Since the newly aligned entity consisted of two component parts which had each taken over services formerly performed by the other, it was inevitable that they would have to coordinate their activities and that one component would occasionally call upon the lawyers who had been and were still representing the other component to do work on matters with which they were pe-

---

12. Of course, to the extent that these law firms represented Walston, that corporation would have been entitled to consider any information conveyed to them to be confidential with respect to the whole world except these particular persons whom Walston knew to be their clients.

12a. For background respecting the crisis which then faced the brokerage industry in general and DGF Inc. in particular see *Hirsch v. duPont* (2d Cir. 1977) 553 F.2d 750.

13. Of course, all this presupposes that there is no Canon 5 problem arising out of any failure of an attorney to make clear any potential conflict to any client. The trustee does not suggest such a problem. In light of the sophistication of all persons involved, any such suggestion would be patently frivolous.

culiarly familiar. But it is inconceivable that Walston or any one concerned with it could have for a moment supposed that, by permitting these lawyers to perform such useful services, Perot and the others were authorizing their lawyers to put themselves in the position of receiving information which they would be required to conceal from their own primary clients. Such a course would have disabled these lawyers from performing the very services (defense from actual or threatened litigation) for which—as everyone knew—their primary clients had retained them. There thus having been no conceivable expectation on the part of anyone connected with Walston that either of these firms would keep secrets from its own clients, no Canon 4 problem can arise.

In summary, it is our conclusion that at the time these law firms are claimed to have acquired their information, neither the corporation nor anyone connected with it had any expectation that either of these law firms would keep secret from their primary clients any information acquired in the course of any services individually per-

formed for Walston. There having been no expectation of such confidentiality at the time the information is alleged to have been acquired, the trustee is not now entitled to claim such confidentiality, and the firms' respective clients are entitled to the continued services of the lawyers upon whose advice they have been relying over these many years.

Most of the cases upon which the trustee 'relies simply assume the existence of a confidential relationship which would prevent the attorney from revealing information to the particular client who is using his services in the litigation in question, and therefore their opinions shed no light on the present question.[14]

Perhaps the most careful consideration of the question of the circumstances in which the existence of a confidence vis-a-vis a particular client can be said to arise occurs in Judge Bryan's opinion in *Marco v. Dulles* (S.D.N.Y.1959) 169 F.Supp. 622, *appeal dismissed* (2d Cir. 1959) 268 F.2d 192.[15] There John Foster Dulles and his firm, Sullivan & Cromwell, had represented both a corpora-

---

**14.** See e. g. *Emle Industries, Inc. v. Patentex, Inc.* (2d Cir. 1973) 478 F.2d 562 (plaintiff's counsel had *previously* represented part owner of defendant corporation in litigation substantially related to this litigation at a time when he was not then plaintiff's counsel.) *NCK Organization Ltd. v. Bregman* (2d Cir. 1976) 542 F.2d 128 (attorney disqualified when *subsequent* to his termination as plaintiff corporation's house counsel he became personal counsel to the President of the corporation and represented the latter, upon his termination, in suit against his former corporate employer on contract he had drafted.) Cf. *Hull v. Celanese Corporation* (2d Cir. 1975) 513 F.2d 568 (former attorney of the defendant corporation who had participated in the defense of this particular sex discrimination suit switched sides to become an additional client of the plaintiffs' attorney. The interesting twist to this case is that it was the additional client's confidence which was found to infect the attorney and cause him to be disqualified from representation of the original group of plaintiffs.

A wholly different theory was invoked in *General Motors Corp. v. City of New York* (2d Cir. 1974) 501 F.2d 639 (former government attorney disqualified not because he held confidences of a former client, but because he brought antitrust suit using information gained while in

government service which gave appearance of official impropriety.)

**15.** In a derivative action in the Southern District of Texas *E. F. Hutton and Company v. Brown* (S.D.Tex.1969) 305 F.Supp. 371, the court disqualified the house counsel of the corporation from representing the corporation against its former President since it found, over counsel's objection, that he had formerly represented the former President in his appearance before the Securities and Exchange Commission regarding the transactions at issue in the derivative action. The court rejected counsel's argument that, assuming he had represented the President, the President knew and expected that any information he revealed to the house counsel would not be kept confidential from the corporation, and therefore that the attorney should not be disqualified pursuant to Canon 4. The court rejected this argument in part because it felt the attorney involved had not adequately disclosed to the President the potential for conflicting interests in their appearing on his behalf and had not adequately disclosed that they considered themselves to primarily represent the corporation. No comparable facts are here present. To the extent the opinion otherwise appears inconsistent with our conclusions, we decline to follow it.

tion and its directors [15a] while the corporation was engaged in certain transactions subsequently attacked by successors in interest to the corporation. In resisting a motion to disqualify Sullivan & Cromwell from representing directors in a resulting derivative action, that firm contended that no confidences could have arisen as between its various clients because all of its then clients were involved in the transactions which were being consummated and were necessarily privy to all the relevant information. Judge Bryan rejected this contention,[16] ruling that just because a director of a corporation has access to all a corporation's information it does not necessarily follow that he avails himself of the opportunity to obtain such information, and hence it might well be that information has been disclosed to Mr. Dulles which he had not then revealed to his individual clients and of which they were otherwise unaware (169 F.Supp. at 628–629).

The distinction between *Marco* and the case at bar is both apparent and instructive. In the first place—unlike the situation at bar—there neither was nor could have been a waiver of potential conflict of interests as between the directors (a clear majority of whom Mr. Dulles and his firm represented) and the corporation. In the second place, at the time those transactions were being consummated there was not—as here—the open and notorious threat of litigation, and Mr. Dulles was not working on the matter for the express purpose of defending the directors against the hazards of such anticipated litigation. In brief, he had not then been under an affirmative duty to the directors, as individuals, to disclose to them any information that he might acquire which might be relevant to eventual litigation. In such circumstances his only obligation to the directors during the period while the transactions were being consummated was to transmit to them such information as they might need in their official capacity. That, as Judge Bryan observed, might

not have been all the information relevant to the subsequent lawsuit. Here, on the contrary, the two law firms—as was well known to the corporation and all concerned with it—had long represented entities separate from Walston and were representing those clients' separate interests in the realignment. Such representation necessarily entailed, among other things, preparing defenses against anticipated litigation. Thus, Walston was on notice that these firms were under a continuing duty to reveal to their clients all information that could have any possible bearing upon such anticipated litigation. The litigation having eventuated, these firms cannot now be said to be in possession of any information which they either must or are entitled to withhold from these particular clients. The motion must therefore be denied.

As observed earlier, the parties stipulated at oral argument that the facts stated in the affidavits and the exhibits submitted in support of this motion are undisputed, and therefore no evidentiary hearing was held. However, in making that stipulation the parties were obviously unaware that the case would be decided on a theory they had not argued. If the trustee wishes to reopen the record for the purpose of offering any evidence which could challenge the conclusion to which the court has arrived, the court will entertain an appropriate motion if made with supporting affidavits on or before May 31, 1977.

This leaves open the question what should be done with the informal stay which has been granted with respect to pre-trial discovery. That stay is continued pending the final disposition of any appeal taken from this order. As the facts stated in this opinion make abundantly clear, the clients of these firms will be put to tremendous expense if they should be forced to retain new counsel who would be required to familiarize themselves with all that has

---

**15a.** Judge Bryan described the situation as follows:

"All of the board's members, with the exception of the senior partner of Sullivan & Crom-

well were individual clients of that firm." (169 F.Supp. at 626).

**16.** He ultimately denied the motion to disqualify on grounds not here relevant.

gone before. That, of course, could not be avoided if the Court of Appeals should find it necessary to disqualify present counsel. However, it would be unconscionable in the meantime to require those clients to continue to pay their present counsel for work which might ultimately have to be duplicated by new counsel.

I find, moreover, that the trustee is in no position to complain about the delay. There appears to me to be no reason why—if time were of the essence—he should have stipulated with his opponents to defer the question of disqualification until after the Court of Appeals had acted on the arbitration matter.[17] Counsel would have been just as disqualified to act before an arbitrator as before a court. In such circumstances it is inconceivable that the Court of Appeals would not have granted the trustee leave to institute this proceeding for disqualification pending final disposition of the appeal pending before it.

Accordingly, the motion to disqualify is denied. A motion to reopen will be entertained if filed with supporting affidavits on or before May 31, 1977. The stay with respect to pretrial discovery is continued pending the final disposition of any appeal taken from this order.

SO ORDERED.

### MEMORANDUM AND ORDER

KNAPP, D. J.

Treating the Trustee's letter of May 27, 1977 as a motion to modify this court's memorandum and order of May 17, 1977 by vacating the stay on pretrial discovery pending of the final disposition of any appeal taken from that order, and treating Weil Gotshal's letter of May 31, 1977 is a response to such motion, the motion is denied.

(a) The Trustee suggests no reason for its almost two year delay in bringing the alleged disqualification to the attention of the court.

(b) We adhere to our views expressed in the order that it would be unfair to

compel the affected defendants to proceed further with attorneys who may not ultimately represent them. In addition to the reasons there expressed we note that if pretrial discovery were allowed pending appeal and if the Trustee were to ultimately prevail on any appeal, the present attorneys might well take positions based upon information they would be prohibited from revealing to their successors.

(c) We can not believe that this disposition deprives the Trustee of a meaningful appeal. (See ¶ 1 of the Trustee's letter of May 27, 1977). The Trustee not having availed itself of our invitation to suggest the presence of any factual question, any appeal would present a discreet question of law with which all parties are fully familiar. A briefing schedule could therefore be arranged which would have the appeal ready for argument within a matter of weeks. We can not believe—in light of the Trustee's arguments for urgency—that the Court of Appeals would not arrange an expedited schedule for the appeal.

The above motion having been denied, and the Trustee having otherwise failed to move to reopen, the Trustee's motion to disqualify the attorneys for DGF Inc., Perot, Hart, Myerson and PHM, and the attorneys for Electronic and E.D. System is denied in accordance with our memorandum and order of May 17, 1977.

SO ORDERED.

---

17. The trustee successfully appealed from an order staying this action pending arbitration, *Allegaert v. Perot*, (2d Cir. 1977), 548 F.2d 432.