565 F.2d 246
 Winthrop J. ALLEGAERT, as Trustee of duPont Walston
Incorporated, Plaintiff- Appellant,
v.
H. Ross PEROT, Electronic Data Systems Corporation, duPont,
Glore Forgan Incorporated, Morton H. Meyerson,
Milledge A. Hart III, PHM & Co. and E.
D. Systems Corporation,
Defendants-Appellees,
and
William K. Gayden, Margot Perot, Mervin L. Stauffer,
Charleston Investment Company, New York Stock Exchange,
Inc., Daniel J. Cullen, William D. Fleming, George T.
Thomson, Charles W. Cox, Douglas E. DeTata, John J. Doughty,
Allan Blair and D. Tipp Cullen, Defendants.
 No. 132, Docket 77-7263.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 29, 1977.
Decided Nov. 7, 1977.
 
 Robert J. Sisk, Hughes, Hubbard & Reed, New York City (George A. Davidson, Karen G. Lind, New York City, of counsel), for plaintiff-appellant.
 Peter Gruenberger, Weil, Gotshal & Manges, New York City (Henry J. Tashman, Irwin H. Warren, New York City, of counsel), for defendants-appellees H. Ross Perot, duPont Glore Forgan Inc., Morton H. Meyerson, Milledge A. Hart III, and PHM & Co.
 Richard P. Shlakman, Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D. C. (Andrew D. Weissman, Washington, D. C., of counsel), for defendants-appellees Electronic Data Systems Corp. and E. D. Systems Corp.
 Before LUMBARD, OAKES and MESKILL, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This dispute is one more example in the ever mounting number of cases where appellants have sought interlocutory review of a district court order. In this instance, appellant challenges an order denying a motion for disqualification[1] under Canon 4 of the Code of Professional Responsibility (Canon 4).[2] The attorneys sought to be disqualified previously represented the entity whose trustee in bankruptcy now demands disqualification. Yet the court below did not reach the question whether there was a substantial relationship between the subject matter of both representations.[3] Rather, Judge Knapp found that at the time appellees' attorneys represented the bankrupt, neither the party now seeking disqualification, appellant here, nor anyone connected with it "had any expectation" that the information acquired would be kept secret from the attorneys' prior, contemporaneous and current clients (primary clients), appellees here. Allegaert v. Perot, 434 F.Supp. 790, 800 (S.D.N.Y.1977). Finding no expectation of confidentiality, Judge Knapp concluded that the appellant is not now entitled to claim it, and that accordingly the attorneys' primary clients may enjoy the continued services of the lawyers upon whose advice they have been relying for many years. On the peculiar facts of this case we affirm.
 
 
 2
 In doing so, we bear in mind our cases, e. g., NCK Organization Ltd. v. Bregman, 542 F.2d 128, 131 (2d Cir. 1976); Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975), which state that the district court's findings on disqualification motions are made in the exercise of its duty to supervise members of its bar and will be disturbed only if the district court has abused its discretion. NCK and Hull also teach that where a past legal representation calls into question the propriety of a present representation of clients whose interests are currently adverse to those of the former client, a detailed consideration of the record is in order.
 
 I. Facts
 
 3
 Appellant is the trustee in bankruptcy of duPont Walston Incorporated (Walston), formerly one of the largest Wall Street brokerage firms. His motion in the district court sought disqualification of two law firms, Weil, Gotshal & Manges (Weil, Gotshal) and Leva, Hawes, Symington, Martin & Oppenheimer (Leva, Hawes). Weil, Gotshal had for some time represented appellees H. Ross Perot and duPont Glore Forgan, Inc. (DGF), another large Wall Street brokerage firm, as well as associated directors of the firm and parties associated with Perot and DGF. Similarly, Leva, Hawes had long represented Electronic Data Systems Corp. (EDS) and E. D. Systems Corp. (E. D. Systems), computer-service companies controlled by Perot. Walston, meanwhile, was represented independently by the Shearman & Sterling firm, who remained general counsel to Walston until 1974 when Walston filed for bankruptcy.
 
 
 4
 A number of Wall Street brokerage firms were in deep financial trouble in the late 1960's and early 1970's. DGF, and its predecessor partnership, was one of those under the most intense financial pressure. One of the biggest firms "on the street," DGF was acquired by Perot and persons and companies controlled by or related to him we can call them the Perot interests allegedly to preserve a lucrative contract between EDS and DGF. When DGF's fortunes continued to sour, the trustee alleges, Perot sought to rescue DGF by joining its operations with Walston's. Whether Walston was in similar straits is disputed. In any event, with Weil, Gotshal and Leva, Hawes representing the Perot interests and DGF, and with Shearman & Sterling representing Walston, DGF and Walston executed a "realignment agreement" which in legal substance resembled a joint venture. Something short of a merger, the agreement permitted each of the two brokerage concerns to retain separate identities while imposing mutual obligations.
 
 
 5
 The lawsuit here in question, like a prior derivative action filed by Nella Walston on behalf of Walston, Walston v. duPont, Glore Forgan, Inc., Index No. 625/74 (N.Y.Sup.Ct., filed Jan. 11, 1974) (Nella Walston ), arose out of the realignment. The complaint contains some 24 claims charging violations of the federal securities laws, the Bankruptcy Act, New York and Delaware state corporation laws and the common law. Essentially, the trustee urges that the realignment agreement was unconscionable, was "railroaded" by the Perot interests through the Walston board of directors, and that performance of the agreement caused Walston to go into bankruptcy. It also alleges that payments made by Walston to DGF constituted unlawful preferences and defrauded both the creditors and stockholders of Walston. The realignment agreement is said to have foisted DGF's liabilities on Walston; Walston allegedly paid sums in excess of market values in its takeover of DGF's failing branch offices. At the same time, the takeover allegedly burdened Walston with significant lease liabilities while DGF siphoned off Walston's assets. The trustee especially complains of Walston's reimbursement of DGF's payment to EDS for computer services rendered to the "back office" operations of the joint venture.[4]
 
 
 6
 While the trustee disparages appellees' role in effectuating the realignment agreement,[5] it does not seek disqualification of Weil, Gotshal and of Leva, Hawes for their participation in the execution of that agreement. Rather, the basis for the disqualification motion is that, after the realignment, Weil, Gotshal and Leva, Hawes purportedly represented Walston on matters substantially related to this lawsuit. Specifically, the two firms are said to have represented Walston in connection with the Nella Walston derivative action, which all parties concede is substantially similar to this action.
 
 
 7
 Each side claims that the law firms' billing records support its position. Thus, the trustee asserts that Weil, Gotshal and Leva, Hawes billed Walston for services rendered in connection with the Nella Walston action and that Leva, Hawes was on retainer to Walston during the period that the action was initiated. Weil, Gotshal and Leva, Hawes claim that the payments from Walston were justified by a provision for reimbursement of legal fees in the realignment agreement. See note 4 supra. The trustee rejoins, however, that Walston was billed directly by the law firms, whereas the realignment agreement provided that DGF would obtain an adjustment from Walston for DGF's legal expenses. But Weil, Gotshal seeks to have the last word by noting that while the bills run directly to Walston, they represent services "rendered (to DGF) in connection with the duPont, Glore Forgan Incorporated-Walston Business Combination," in relation to the Nella Walston litigation. Joint Appendix at 213. Similarly, Leva, Hawes concedes that it billed Walston for approximately ten hours its attorney spent working on the Nella Walston case, but claims to have done so at the direction of Walston's officers with responsibility for approving legal fees.
 
 
 8
 After the realignment, other work done by the law firms consisted of advice on a spectrum of legal matters including investment banking, real estate, employee fringe benefit plans, pending customer litigation, antitrust, and taxes. The trustee agrees that most of these matters were not substantially related to this lawsuit. He does contend, however, that there were four substantially related types of services. These include services rendered in connection with closing and selling Walston branch offices formerly owned by DGF, preparation of amendments to the realignment agreements, research on the possible liquidation of Walston, and review of corporate minutes. Both Shearman & Sterling, Walston's general counsel at the time, and Weil, Gotshal agree that Weil, Gotshal's work on branch office closings was performed for DGF, even though billed to Walston. The record does not indicate what the amendments to the realignment agreements involved. Research on the possible liquidation of Walston is claimed to be related to this suit because the date of bankruptcy is critical to establishing the Bankruptcy Act claims of fraudulent transfers. Leva, Hawes contends that its review of the crucial board meeting of July 1 and 2, 1973, when the realignment agreement was "railroaded" through, was done on behalf of its clients, EDS and E. D. Systems. However, we need not resolve these disputed facts because we are in substantial agreement with the district court's reasoning.
 
 II. Discussion
 
 9
 Our rule, made plain by NCK Organization Ltd. v. Bregman, supra, 542 F.2d at 133-34; Hull v. Celanese Corp., supra, 513 F.2d at 571-72; and Emle Industries, Inc. v. Patentex, 478 F.2d 562, 570-71 (2d Cir. 1973), is that an attorney may be disqualified pursuant to Canon 4 if he has accepted employment adverse to the interests of a former client on a matter substantially related to the prior litigation. Once the substantial relationship is established, the court need not inquire whether the attorney in fact received confidential information, because the receipt of such information will be presumed. See T. C. Theatre Corp. v. Warner Brothers Pictures, Inc., 113 F.Supp. 265, 268 (S.D.N.Y.1953). However, as Judge Knapp has perceptively pointed out, Allegaert v. Perot, supra, 434 F.Supp. at 798, before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client. NCK, Hull, Emle and T. C. Theatre Corp. do not address this issue because the prior confidential relationships were obvious.
 
 
 10
 Because Walston necessarily knew that information given to Weil, Gotshal and Leva, Hawes would certainly be conveyed to their primary clients in view of the realignment agreement, the substantial relationship test is inapposite. Neither Walston nor anyone connected with it could have thought that the Weil, Gotshal and Leva, Hawes firms were representing Walston without appellees' knowledge and approval, or that any information given to the law firms conceivably would have been held confidential from the primary clients of the firms. At every step Walston was advised by Shearman & Sterling. Moreover, Walston knew that Perot, DGF and the Perot interests were at all times represented by Weil, Gotshal and Leva, Hawes. Any work that Weil, Gotshal or Leva, Hawes performed for Walston was pursuant to the realignment agreement. All other legal work in dispute on this appeal was performed by Weil, Gotshal and Leva, Hawes for their primary clients.[6]
 
 
 11
 Integral to our conclusion that Weil, Gotshal and Leva, Hawes were not positioned to receive information intended to be withheld from DGF is the law firms' continuous and unbroken legal relationship with their primary clients. In contrast with our earlier cases, the attorneys sought to be disqualified here have not changed sides from a former client to a current, adverse client. In Emle, plaintiff's counsel had previously represented a part owner of the defendant corporation in substantially related litigation at a time when he was not plaintiff's counsel; in other words, he was changing from the defendant's side to the plaintiff's. We also found a switchover of representation in NCK. There, house counsel to the plaintiff corporation became personal counsel to the president after both had been terminated. The former house counsel represented the former president in a suit against the corporation on an employment contract which house counsel had prepared for his corporation. And in Hull, a former attorney of Celanese Corporation who had participated in the defense of a Title VII suit switched sides to become an additional client of the plaintiff's attorney in the very same litigation. It was the new client/former attorney who might have received confidences while serving as a defense counsel which we found to infect the plaintiff's counsel. Emle, Hull, and NCK do not control this disqualification motion because at all times Weil, Gotshal and Leva, Hawes represented the Perot interests. Any representation of Walston was done with Walston's knowledge that the firms were still representing the Perot interests and would continue to do so. Weil, Gotshal and Leva, Hawes never changed sides.[7]
 
 
 12
 In light of our disposition along the lines of Judge Knapp's opinion below, we need not reach the question of substantial relationship. Nor do we need to discuss appellees' contentions of waiver by Walston or laches by the trustee. We do note in passing, however, our concern as expressed by Judge Van Graafeiland in Lawyer's Conflict of Interest A Judge's View (Part II), N.Y.L.J., July 20, 1977, at 1, col. 2, that disqualification motions have become "common tools of the litigation process, being used . . . for purely strategic purposes," a concern also recognized by Judge Gurfein in his concurring opinion in J. P. Foley & Co. v. Vanderbilt, 523 F.2d 1357, 1360 (2d Cir. 1975) (such motions characterized as "tactics of an adversary proceeding"). Nearly eight months have elapsed in the attempt to attain disqualification, with discovery necessarily suspended during this period, a matter which strangely bothers the appellant who sought the disqualification. While we do not at this stage request rehearing en banc to reconsider the wisdom of Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 496 F.2d 800 (2d Cir. 1974) (en banc), we continue to emphasize the great reliance we place upon the district court's exercise of discretion.
 
 
 13
 Judgment affirmed.
 
 
 
 [1]
 Orders on disqualification motions have been appealable in this circuit since Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 496 F.2d 800 (2d Cir. 1974) (en banc). Appealability has been subject to mounting criticism, however. See W. T. Grant Co. v. Haines, 531 F.2d 671, 677-78 (2d Cir. 1976); International Electronics Corp. v. Flanzer, 527 F.2d 1288, 1289 (2d Cir. 1975); Van Graafeiland, Lawyer's Conflict of Interest A Judge's View (Part II), N.Y.L.J., July 20, 1977, at 1, col. 2. See also J. P. Foley & Co. v. Vanderbilt, 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J., concurring)
 
 
 [2]
 Canon 4 provides that "(a) lawyer should preserve the confidences and secrets of a client." ABA Code of Professional Responsibility, Canon 4
 
 
 [3]
 The substantial relationship test was conceived in Judge Weinfeld's seminal decision in T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265 (S.D.N.Y.1953), and has since been explored in a series of cases in this court. See, e. g., NCK Organization Ltd. v. Bregman, 542 F.2d 128, 132-33 (2d Cir. 1976); Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 754-57 (2d Cir. 1975); Hull v. Celanese Corp., 513 F.2d 568, 571-72 (2d Cir. 1975); Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 570-73 (2d Cir. 1973)
 
 
 [4]
 The back office operations included, among other things, processing customer accounts, clearing securities and performing accounting services. Parenthetically, it should be noted that the realignment agreement, dated July 2, 1973, specifically provided that Walston would reimburse DGF for legal expenses incurred on its behalf. Paragraph 6 of the agreement called for the payment by Walston of monthly "adjusting charges," including "all audit and legal fees (of DGF), excluding any such fees attributable to transactions occurring prior to July 2, 1973 . . . ." Joint Appendix at 158-61
 
 
 [5]
 According to the trustee, the Perot Plan was railroaded through the Walston Board of Directors in July 1973 by a vote of 10-9, after insufficient notice of the lengthy and complex realignment agreements and at a Sunday Board meeting that lasted until the early hours of Monday morning, during which the Perot representatives made numerous misrepresentations and omissions of material information and promises of improper benefits. The trustee also alleges and (sic ) the NYSE, because of its own interest in preserving the capital of DGF, Inc., concealed the conclusions of its own staff that Walston's capital would be completely depleted in eight months if the Perot Plan were adopted. After the Plan went into effect, Walston allegedly lost over $30 million and was forced to liquidate its business
 Allegaert v. Perot, 548 F.2d 432, 434 (2d Cir.) (footnote omitted), cert. denied, 432 U.S. 910, 97 S.Ct. 2959, 50 L.Ed.2d 1084 (1977).
 
 
 [6]
 Much is made of the fact that Walston was billed directly, rather than precisely in accordance with the realignment agreement. But the district court clearly indicated that these billings were made pursuant to the realignment agreement. Allegaert v. Perot, supra, 434 F.Supp. 790, 794-95 (S.D.N.Y.1977)
 
 
 [7]
 Our holding rests on Canon 4 grounds. We note parenthetically that the trustee has not suggested that Canon 5 applies. That canon condemns failures of counsel to make clear any potential conflicts of interest. Here, of course, the parties were not only aware of their mutual relationship, but also were as sophisticated, perhaps, as the American corporate community can be. Much of the work, as in the defense of the Nella Walston derivative lawsuit, was performed as a matter of mutual cooperation to avoid duplication of effort. Similarly, in connection with other "business-combination" activities, one component would call upon the lawyers of the other component to do work on matters, such as the closing of the DGF branch offices, with which the lawyers were peculiarly familiar. Necessarily, it was assumed that on all of these matters any information garnered would be available to the primary clients