IN THE SUPREME COURT OF NORTH CAROLINA

No. 310A16

Filed 8 December 2017

DENNIS WORLEY, STERLING KOONCE, FLYING A LIMITED PARTNERSHIP
L.P., JOSEPH W. FORBES JR., KENNETH CLARK, JAMES BOGGESS, JOEL
WEBB, JAIMIE LIVINGSTON, JAMES E. BENNETT JR., DAVID MINER,
RONALD ENGLISH, and MDF, LLC

v.

ROY J. MOORE, PIERCE J. ROBERTS, DAVID BROWN, MICHAEL ADAMS,
CHRISTOPHER BAKER, JAMES KERR, FRANK McCAMANT, NEIL KELLEN,
GINI COYLE, JOSEPH MOWERY, TOSHIBA CORPORATION, ALAMO
ACQUISITION CORP., and STEPHENS, INC.

Appeal pursuant to N.C.G.S. § 7A-27(a)(3) from an order dated 13 May 2016

by Judge Gregory P. McGuire, Special Superior Court Judge for Complex Business

Cases appointed by the Chief Justice under N.C.G.S. § 7A-45.4, in Superior Court,

Columbus County. Heard in the Supreme Court on 29 August 2017.

> *Nexsen Pruet, PLLC, by R. Daniel Boyce and David S. Pokela; and Ganzfried*
> *Law, by Jerrold J. Ganzfried, pro hac vice, for plaintiff-appellees.*

> *Kilpatrick Townsend & Stockton LLP, by Adam H. Charnes and John M. Moye,*
> *for defendant-appellants.*

NEWBY, Justice.

In this case we consider whether the trial court properly disqualified

defendants' counsel under North Carolina Rule of Professional Conduct 1.9(a). This

rule balances an attorney's ethical duties of confidentiality and loyalty to a former

client with a party's right to its chosen counsel. The rule permits disqualification of

an attorney from representing a new client if there is a substantial risk that the attorney could use confidential information shared by the client in the former matter against that same client in the current matter. This analysis requires the trial court to determine whether confidential information that would normally have been shared in the former matter is also material to the current matter. To do so, the trial court must objectively assess the scope of the representation and whether the matters are substantially related. Rather than applying an objective test, here the trial court disqualified defendants' counsel based on the former client's subjective perception of the past representation as well as the now replaced "appearance of impropriety" test. As a result, we reverse the trial court's decision and remand this matter to that court for application of the appropriate legal standard.

The factual background leading to the instant litigation involves three other disputes, all relating to plaintiff Joseph W. Forbes's former employer Consert, Inc. (Consert): a patent dispute between Forbes and Consert (the patent dispute), Forbes's 220 shareholder inspection rights action against Consert (the 220 action), and a contract dispute between Itron, Inc. (Itron) and Consert (the *Itron* litigation).

Plaintiff Forbes is one of thirteen named plaintiffs in the present action, all former shareholders of Consert. Beginning in 2008, Forbes was a shareholder and member of the Board of Directors of Consert and served as Chief Operating Officer. In the fall of 2011, Forbes was removed as an officer and director but remained a significant shareholder. Soon after his removal, Forbes and Consert disagreed about

Forbes's unpaid compensation and ownership of certain patents (the patent dispute), but the dispute never resulted in direct litigation even though Forbes was represented by counsel.

Sometime in 2012, Toshiba, a technology company, expressed interest in purchasing Consert. Concerned about the proposed sale, Forbes sued Consert in December 2012 under Section 220 of the Delaware General Corporation statutes (the 220 action), asserting his shareholder rights and requesting certain corporate records regarding the sale. In the 220 action, Forbes referenced, *inter alia*, the ongoing patent dispute in his allegations concerning Consert's mismanagement.

At the same time, Consert was also defending a lawsuit filed by Itron, a licensee and successor in interest to a development agreement with Consert, over certain payment terms under that agreement (the *Itron* litigation). Based on Forbes's allegations in the 220 action, Itron amended its complaint to include claims based on Consert's failure to disclose the ongoing patent dispute with Forbes.

Amidst the *Itron* litigation, Toshiba acquired Consert on 5 February 2013 as a wholly owned subsidiary. Following the Consert–Toshiba merger, Consert engaged Kilpatrick Townsend & Stockton LLP (Kilpatrick) to represent it in the *Itron* litigation. Itron sought to depose Forbes regarding the Consert–Toshiba merger, the 220 action, and primarily the patent dispute with Consert.[1] By mid-February 2013,

---

[1] Forbes produced requested documents during the *Itron* litigation while represented

Forbes and Consert settled the 220 action, and by May 2013, Forbes and Consert resolved the patent dispute, leaving only the *Itron* litigation unresolved.

In October 2013, counsel from Winston & Strawn, LLP, who represented Forbes at the time, communicated with Joe Bush of Kilpatrick (Bush),[2] counsel to Consert, about Forbes's deposition. Bush disclosed to Forbes's counsel that, in addition to his primary representation of Consert, he also represented former employees and shareholders of Consert in the *Itron* litigation. Bush later offered limited representation to Forbes at Consert's expense as long as Forbes agreed to the proposed engagement terms. Forbes eventually agreed that Bush would represent him in the *Itron* litigation regarding his role as a former Officer and Director of Consert.

On 23 January 2014, Forbes signed an engagement letter that outlined the terms of Bush's limited representation of Forbes (the engagement letter), which began by stating, "As you are aware, this firm is outside litigation counsel to [Consert] in connection with the [*Itron* litigation]." The engagement letter then explained that the representation of Forbes would "be limited to legal services associated with discovery efforts (such as depositions, witness statements, factual development, and

by Winston & Strawn, LLP. Kilpatrick did not assist Forbes with document production.

[2] Plaintiff seeks to disqualify both Bush and Kilpatrick, his law firm, from representing defendants. For simplicity, references hereinafter to "Bush" include both him and his law firm as counsel.

document analysis), [Forbes's] potential testimony at trial, and specifically in connection with [Forbes's] former role as Chief Operating Officer of Consert." Forbes agreed that he would be "willing to permit Kilpatrick Townsend to disclose to Consert, to any related entities, and to the employees of these entities, any of the information it learns in its communications with [him] if, in [counsel's] discretion, it becomes necessary or appropriate to the defense of this lawsuit." Forbes also agreed that he would "not object to Kilpatrick Townsend continuing to represent Consert and its related entities in this lawsuit" should a conflict of interest arise. Winston & Strawn negotiated the terms of the limited representation on behalf of Forbes.

Forbes's counsel from Winston & Strawn initially prepared him for his deposition and communicated with Forbes via teleconference two to three times for approximately an hour on each occasion. In final preparation, Forbes met with Bush once for approximately two to three hours the night before the deposition. Forbes's privately retained counsel from Winston & Strawn attended approximately an hour of that meeting.

During the deposition the next day, Itron's counsel asked Forbes about his relationship with Consert, the 220 action, the Consert–Toshiba merger, and primarily the patent dispute. Twice during the deposition, Forbes requested a break and spoke with his privately retained counsel from Winston & Strawn, even though Bush was present at the deposition. When asked about the Consert–Toshiba merger, Forbes stated, "I have not read the agreement of the merger between [Toshiba] and

Consert. That might come as a surprise to you, but I have not read it." The *Itron* litigation settled on 1 February 2015.

At some point on or before 5 February 2015, Forbes and counsel at Winston & Strawn recognized Forbes's potential claims at issue in the present action. As a result, on 5 February 2015, Winston & Strawn sent a litigation hold letter to Bush, based on his representation of Toshiba affiliates, informing him that Forbes and other former Consert shareholders were considering filing the present action. On 9 November 2015, Forbes and other former Consert shareholders filed the present action against Toshiba (as the parent company of Consert) and former officers, directors, and shareholders of Consert, some of whom were jointly represented by Bush in the *Itron* litigation.[3] Defendants retained Bush to represent them against plaintiffs. Plaintiffs allege that, through the Consert–Toshiba merger agreement, defendants engaged in a "collusive scheme" to "benefit themselves and to defraud Plaintiffs out of millions of dollars that Plaintiffs should have received for the shares of stock they had purchased and held in Consert."[4] The merger agreement included "earn out" provisions that obligated Toshiba to pay certain future proceeds directly to

---

[3] On 16 November 2016, the Chief Justice designated this case as a complex business case.

[4] Specifically, plaintiffs assert the following claims against defendants: (1) breach of fiduciary duty, (2) common law fraud, (3) constructive fraud, (4) conspiracy to defraud, (5) fraudulent inducement, (6) violation of the North Carolina Securities Act, (7) unlawful taking, conversion, and unjust enrichment under common law, and (8) violation of the North Carolina Unfair and Deceptive Trade Practices Act.

a "Shareholders Fund" for distribution to Consert stockholders. Two post-merger events, including resolution of the *Itron* litigation, would fund this account. Plaintiffs, however, contend that the earn out provisions were "illusory and a sham" because defendants knew at the time of the agreement that the triggering events required to generate the proceeds at issue would never occur, thus precluding any payment to the shareholders.

Before the trial court, plaintiffs moved to disqualify Bush from the present action based on his past representation of Forbes during the *Itron* litigation. In support of the motion, Forbes filed a declaration stating his views of the prior relationship and outlining his communications with Bush. Defendants responded that the communications between Forbes and Bush were not confidential because the engagement letter expressly limited the nature of Bush's representation of Forbes and specifically authorized Bush to disclose, in his discretion, "any of the information" he learned in his communications with Forbes to "Consert," "any related entities," and their "employees" during the *Itron* litigation.

Recognizing that the facts here presented a "close case," the trial court noted:

> In considering a motion to disqualify counsel, the Court considers the professional obligations imposed on attorneys by the North Carolina Rules of Professional Conduct . . . , as well as the goal of preventing the appearance of impropriety in the profession. Disqualification of counsel is a serious matter . . . and the moving party has a high standard of proof to meet in order to prove that counsel should be disqualified. Nevertheless, a motion to disqualify counsel . . . . should succeed or fail

on the reasonableness of a client's perception that
confidences it once shared with its lawyer are potentially
available to its adversary.

(Second ellipsis in original) (internal citations and quotation marks omitted).

The trial court found that an attorney–client relationship existed between Bush and Forbes in the past representation and that defendants' position is materially adverse to Forbes's position in the present action, thus leaving unresolved only whether the current matter is "substantially related to the matter in which Bush and Kilpatrick previously represented Forbes." In particular, quoting *Plant Genetic Systems, N.V. v. Ciba Seeds*, 933 F. Supp. 514, 518 (M.D.N.C. 1996), the trial court sought to answer whether "there is a reasonable probability that confidences were disclosed in the prior representation which could be used against the former client in the current litigation."

In its analysis the trial court resolved this issue by trying to discern what actually occurred during the past representation as stated by Forbes and Bush. The trial court relied on Forbes's declaration, which included his characterizations of the attorney–client relationship. The trial court quoted portions of the declaration detailing Forbes's impressions of the nature of his communications with Bush and conversely observed that Bush had not refuted Forbes's "descriptions or characterizations of the information he shared with Bush during the prior representation."

In reviewing the engagement letter, the trial court focused on the absence of evidence showing that Bush actually disclosed any confidential information provided by Forbes while the *Itron* litigation was ongoing. Moreover, by the terms of the engagement letter, Forbes's permission to disclose ended with the *Itron* litigation, thereby limiting future disclosure by Bush. Absent evidence of actual disclosure, the trial court found the engagement letter had little bearing on its analysis. The trial court gave substantial weight to Forbes's "perception" that the prior disclosures could be used to his disadvantage, which the trial court found was not "unreasonable." Ultimately, the trial court determined that "the significant areas of overlap between the issues in the two representations strongly suggest that the two matters are 'substantially related.'"

Notably, the trial court determined, "Even if the matters are not substantially related within the strict meaning of Rule 1.9(a), however, the Court would nonetheless conclude, in its discretion, that Bush and Kilpatrick should be disqualified in order to avoid the appearance of impropriety." As a result, the trial court disqualified Bush because his "continued representation of Defendants in this matter creates an appearance of impropriety that the Court cannot allow." Defendants appealed.

"Decisions regarding whether to disqualify counsel are within the discretion of the trial judge," *Travco Hotels, Inc. v. Piedmont Nat. Gas Co.*, 332 N.C. 288, 295, 420 S.E.2d 426, 430 (1992), but a trial court's exercise of discretion is subject to reversal

when the court orders disqualification based on a misunderstanding of the law, *see In re Estate of Skinner*, ___ N.C. ___, ___, 804 S.E.2d 449, 457 (2017); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461, 110 L. Ed. 2d 359, 382 (1990) (noting that the "[trial] court would necessarily abuse its discretion [in deciding a Rule 11 motion] if it based its ruling on an erroneous view of the law"). The movant seeking to disqualify his former counsel must meet a particularly high burden of proof. *See Gov't of India v. Cook Indus.*, 569 F.2d 737, 739 (2d Cir. 1978) ("[T]here is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel . . . .").

Rule 1.9(a), governing the disqualification of counsel for a conflict of interest relating to a former client, balances the prevented use of confidential information against a former client with a current client's right to choose his counsel freely. *See, e.g.*, N.C. St. B. Ethics Op. RPC 48 (Oct. 28, 1988), *reprinted in North Carolina State Bar Lawyer's Handbook 2016*, at 217 (2016) (recognizing, *inter alia*, "the right of clients to counsel of their choice"). The rule prevents an attorney from using confidential material information received from a former client against that client in current litigation. *See* N.C. St. B. Rev. R. Prof'l Conduct r. 1.9 cmt. 1 ("After termination of a client-lawyer relationship, a lawyer has certain continuing duties

with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with this Rule.").[5]

Rule 1.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

N.C. St. B. Rev. R. Prof'l Conduct r. 1.9(a). Under Rule 1.9(a), a party seeking to disqualify opposing counsel must establish that (1) an attorney–client relationship existed between the former client and the opposing counsel in a matter such that confidential information would normally have been shared; (2) the present action involves a matter that is the same as or substantially related to the subject of the former client's representation, making the confidential information previously shared material to the present action; and (3) the interests of the opposing counsel's current client are materially adverse to those of the former client.

In applying Rule 1.9(a), the trial court considers the circumstances surrounding each representation to objectively assess what would "normally" have occurred within the scope of that representation.[6] *See id.* r. 1.9 cmt. 3 ("A conclusion

---

[5] *See Nix v. Whiteside*, 475 U.S. 157, 168-70, 106 S. Ct. 988, 994-96, 89 L. Ed. 2d 123, 135-37 (1986) (relying on the guidance offered in the commentary of the Rules of Professional Conduct to interpret the Rules).

[6] *See Normal*, *Black's Law Dictionary* (10th ed. 2014) ("According to a regular pattern; . . . In this sense, its common antonyms are *unusual* and *extraordinary*. . . . According to an

about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services."). The test is whether, objectively speaking, "a substantial risk" exists "that the lawyer has information to use in the subsequent matter." *Id.*; *see id.* r. 1.9 cmt. 2 ("The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."). The test does not rely on the subjective assessment provided by the former client or the attorney. *See* Restatement (Third) of The Law Governing Lawyers § 132A cmt. d(iii) (Am. Law Inst. 2017) ("[It] would be self-defeating if, in order to obtain its protection, the former client were required to reveal in a public proceeding the particular communication or other confidential information that could be used in the subsequent representation.").

Here it is undisputed that the third prong of the test under Rule 1.9(a) is satisfied: the interests of Forbes and defendants in the present action are "materially adverse." For the two remaining prongs, the trial court must consider the scope of the past representation to determine whether the former client would normally have shared confidential information in the course of that representation and, if so, whether that information is material to the present action. *See* N.C. St. B. Rev. R.

---

established rule or norm . . . ."); *Objective*, *Black's Law Dictionary* (10th ed. 2014) ("Of, relating to, or based on externally verifiable phenomena, as opposed to an individual's perceptions, feelings, or intentions . . . .").

Prof'l Conduct r. 1.9 cmt. 2 ("The scope of a 'matter' for purposes of this Rule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree.").

The first prong of Rule 1.9(a) explores the existence and scope of an attorney–client relationship between the attorney and the former client. "[A]n attorney-client relationship is formed when a client communicates with an attorney *in confidence* seeking legal advice regarding a specific claim and with an intent to form an attorney-client relationship." *Raymond v. N.C. Police Benevolent Ass'n*, 365 N.C. 94, 98, 721 S.E.2d 923, 926 (2011) (emphasis added) (citation omitted). The scope of such a relationship, however, is a matter of contract, and a lawyer may reasonably limit the scope and expectations of the representation "by agreement with the client or by the terms under which the lawyer's services are made available to the client." N.C. St. B. Rev. R. Prof'l Conduct r. 1.2 cmt. 6.

The commentary to Rule 1.9(a) anticipates the use of engagement letters that outline both the scope of representation and limitations on confidentiality at the time the former client engaged counsel. *See id.* r. 1.9 cmt. 2 (describing a lawyer's involvement in a "matter" as dependent "on the facts of a particular situation or transaction" and the "degree" of engagement). For example, a common representation agreement could provide for the sharing of confidential information among the co-parties represented by the same attorney but keep the information confidential as to third-parties. Likewise, a former client's concurrent representation

by another attorney also informs as to the degree of the contested counsel's involvement and the confidences normally shared by a client in that situation. Thus, under the rule, the emphasis is not on the traditional notions of the formation of an attorney–client relationship, but on the scope of that relationship, when ascertaining the reasonable expectation of confidentiality under the circumstances. *See Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir. 1977) (Disqualification is not warranted unless "the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client.").

Here the trial court erred by trying to determine whether Forbes actually shared confidential information with Bush that Bush did not share with the other parties to the common representation agreement. Instead, the trial court should apply the objective test of whether a client in Forbes's position would normally have shared confidential information given the terms of the engagement letter and the type of disclosure that usually occurs within that common representation arrangement. Further, the trial court failed to consider the normal implications of simultaneous and ongoing representation of Forbes by other counsel. On remand, the trial court should objectively consider what confidential factual information "would normally have been obtained" within the scope of the past representation. N.C. St. B. Rev. R. Prof'l Conduct r. 1.9 cmt. 3.

If the trial court determines that confidential information would normally have

been shared within the scope of the past representation, it must then consider whether that information is material to the present action by deciding if the two matters are "substantially related." A former client must objectively demonstrate "a substantial risk that [confidential] information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Id.* Through an objective, fact-intensive inquiry, the trial court is best suited to determine whether such a substantial risk exists. *See id.* (considering "the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services"); *see also* Restatement (Third) of The Law Governing Lawyers § 132A cmt. d(iii) (Am. Law Inst. 2017) ("The substantial-relationship test . . . focus[es] upon the *general features* of the matters involved and inferences as to the likelihood that confidences were imparted by the former client that could be used to adverse effect in the subsequent representation." (emphasis added)).

In assessing whether two matters are "substantially related," the trial court should consider, *inter alia*, the following illuminative factors: (1) the initial engagement letter, including the scope of the representation and any limitations on confidentiality; (2) the factual background leading to the past representation, including common representation of others and any concurrent representation of the former client; (3) the amount of time spent with the attorney; (4) the subject matter of the two representations; and (5) all of the facts and circumstances of the current

litigation, particularly as compared with those of the past representation.  A former

client's subjective perception or conclusory allegations that he shared confidential

information during the past representation should not be considered.  *See, e.g., Silver*

*Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 756-57 (2d Cir. 1975).

Here the trial court erred by concluding that the matters appeared to be

"substantially related" based on Forbes's conclusory belief that he had shared

confidential information with Bush "directly related to the claims . . . against

Defendants in this case."  Thus, the trial court improperly determined

disqualification in reliance on the former client's subjective judgment, which Rule

1.9(a) prohibits, rather than objectively comparing the facts and circumstances of

both representations.

In its final rationale, the trial court mistakenly applied the now replaced

"appearance of impropriety" test as a consideration in favor of disqualification.

Unlike its predecessor, the Model Code of Professional Responsibility, the Rules of

Professional Conduct do not recognize "appearance of impropriety" as a basis for

disqualification, having deleted any reference to this standard in the 2002 revisions.[7]

---

[7] The Model Rules of Professional Conduct, of which Rule 1.9 is a part, replaced the ABA Code of Professional Responsibility, which dated back to canons first promulgated in 1908.  *See* Monroe H. Freedman, *The Kutak Model Rules v. the American Lawyer's Code of Conduct*, 26 Vill. L. Rev. 1165, 1165 (1981).  Under the ABA Code, parties generally moved for disqualification under Canon 4, "A Lawyer Should Preserve the Confidences and Secrets of a Client," and Canon 9, "A Lawyer Should Avoid Even the Appearance of Professional Impropriety."  Model Code of Prof'l Responsibility Canons 4, 9 (Am. Bar Ass'n 1980).  By 1986 North Carolina had adopted the Model Rules of Professional Conduct as its governing

The tendency of the old test to lean towards a subjective, rather than objective, analysis rendered it "no longer helpful."[8]  As a result, the "appearance of impropriety" test is no longer an appropriate legal standard for determining whether to disqualify counsel.

In sum, the trial court applied the incorrect standard under Rule 1.9(a) in disqualifying defendants' counsel.  In making its determination upon remand, the trial court must objectively assess the facts surrounding the motion to disqualify counsel without relying on the former client's subjective perception of his prior representation.  The trial court should avoid the outmoded "appearance of impropriety" test.  We reverse the trial court's decision and remand this case to that court for application of the correct legal test.

REVERSED AND REMANDED.

Justice ERVIN did not participate in the consideration or decision of this case.

---

standard.

[8] *See A Legislative History* 242 (Art Garwin ed., 2013) (noting that the Ethics 2000 Commission Reporter's Explanation of Proposed Changes included the statement that comment 5, referencing the appearance of impropriety standard, was "deleted as no longer helpful to the analysis of questions arising under this Rule").