Mauck v. Cherry Oil Co., Inc., 2021 NCBC 59.

STATE OF NORTH CAROLINA

LENOIR COUNTY

ARMISTEAD B. MAUCK and
LOUISE CHERRY MAUCK,

　　　　　　Plaintiffs,

v.

CHERRY OIL CO., INC.; JULIUS P.
"JAY" CHERRY, JR.; and ANN B.
CHERRY,

　　　　　　Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 343

**ORDER AND OPINION ON MOTION
TO DISQUALIFY WOMBLE BOND
DICKINSON AND MOTION TO
WITHDRAW**

THIS MATTER is before the Court on Plaintiffs' Motion to Disqualify Womble Bond Dickinson ("Motion to Disqualify," ECF No. 12) and the Motion to Withdraw of Graebe Hanna & Sullivan, PLLC ("Motion to Withdraw," ECF No. 8).

THE COURT, having considered the motions, the affidavits, the arguments of counsel, and the record, CONCLUDES that the Motion to Disqualify should be DENIED and the Motion to Withdraw should be GRANTED.

*Brooks, Pierce, McLendon, Humphrey and Leonard LLP, by Walter L. Tippett and Katarina K. Wong, for Plaintiffs Armistead B. Mauck and Louise Cherry Mauck.*

*Graebe Hanna & Sullivan, PLLC, by M. Todd Sullivan, for Defendant Cherry Oil, Inc., and Womble Bond Dickinson (US) LLP, by Samuel B. Hartzell and Pressly M. Millen, for Defendants Cherry Oil Co., Inc.; Julius P. "Jay" Cherry, Jr.; and Ann B. Cherry.*

Davis, Judge.

**INTRODUCTION**

1.　The pending motions require the Court to determine whether in a shareholder derivative action a single law firm may simultaneously represent both

the corporation and its individual directors, who are alleged to have engaged in wrongful conduct against the corporation.

## FACTUAL AND PROCEDURAL BACKGROUND

2. In reciting the factual background of this case, the Court considers the First Amended Complaint ("Amended Complaint," ECF No. 18) and the various affidavits submitted by the parties in connection with the pending motions. The Court limits its recitation of the background facts to those that are relevant for purposes of deciding the motions. *See Harriott v. Cent. Carolina Surgical Eye Assocs., P.A. (In re Estate of Harriott)*, 2015 NCBC LEXIS 43, at *3 (N.C. Super. Ct. Apr. 28, 2015).

3. This action, succinctly put, concerns a dispute among family members over the management and future direction of a family business. Defendant Cherry Oil Company, Inc. ("Cherry Oil")[1] is a business that, both directly and through its affiliates, owns and operates a substantial propane and refined fuel distribution operation. (*Id.* at ¶ 1.) Cherry Oil and its affiliates have been owned and managed by members of the individual parties' extended family since Cherry Oil was founded in 1928 by J.P. Cherry, Sr. (*Id.* at ¶¶ 2, 15, 32.)

4. Plaintiffs Armistead B. Mauck ("Armistead") and Louise Cherry Mauck ("Louise") are married and together own and control 194 (approximately 34%) of

---

[1] Cherry Oil is a North Carolina corporation with its registered place of business in Lenoir County, North Carolina. (*Id.* at ¶ 9.)

Cherry Oil's shares.[2]  (*Id.* at ¶ 8.)  Armistead has served as an officer and director of Cherry Oil since 1995 and currently serves as a vice president, secretary, and treasurer.  (*Id.* at ¶ 6; Mauck Affidavit, ECF No. 14, at ¶ 2.)  Louise has served as an officer of Cherry Oil since August 2000 and currently serves as a vice president and assistant secretary.  (ECF No. 14, at ¶ 3.)  Louise also served as a director from August 2000 until June 16, 2021.[3]  (ECF No. 18, at ¶ 7.)

5.    Defendants Julius P. "Jay" Cherry, Jr. ("Jay") and Ann B. Cherry ("Ann") are married and together own and control 390 (approximately 66%) of Cherry Oil's shares.[4]  (*Id.* at ¶ 12.)  Jay is Louise's brother and serves both as the chairman of the Board of Directors ("Board") and as president of Cherry Oil.  (*Id.* at ¶¶ 10, 15.)  Ann is a director, vice president, and assistant secretary of Cherry Oil.  (*Id.* at ¶ 11.)

6.    The dispute that gave rise to this lawsuit began in or around 2007, when Jay and Ann's son, Jason Cherry ("Jason"), joined Cherry Oil as an employee.  (*Id.* at ¶ 43.)  Plaintiffs allege that Jason lacks "commit[ment] to developing the skills or doing the work necessary to succeed on individual merit, rather than nepotism," pointing to critical reviews of Jason's job performance by company employees.  (*Id.* at ¶¶ 44, 46; *see* ECF Nos. 18.2–18.3.)

---

[2] The parties agree as to Armistead's ownership of 97 shares (17%) and Louise's ownership of 97 shares (17%).  (*Id.* at ¶¶ 6–7.)  However, a dispute currently exists over whether Armistead also owns an additional 30 shares.  (*Id.* at ¶ 13.)

[3] Defendants contend that Louise was removed from the Board in June 2021, but the validity of her removal is disputed by Plaintiffs.  (*Id.* at ¶ 7.)

[4] Jay owns 348 shares (59%) while Ann owns 42 shares (7%).  (*Id.* at ¶¶ 10–11.)

7.      Plaintiffs' dissatisfaction with Jason's performance at Cherry Oil derives in part from their concern over the prospect of Jason ultimately obtaining control of Cherry Oil—given "Jay's desire to retire and to complete estate planning, part of which involves leaving Jason, despite chronic shared concerns of all parties, potentially in a controlling ownership position." (*Id.* at ¶ 47.)

8.      Plaintiffs allege that over the eighteen-month period leading up to this lawsuit

> Jay and Ann have acted in concert to divide the extended family, setting brother against sister as Jay and Ann seek to consolidate their control over Cherry Oil to themselves for the benefit of themselves and what they call their "next generation" to the exclusion and at the expense of Armistead and Louise and Cherry Oil.

(*Id.* at ¶ 55.)   Plaintiffs contend that Jay and Ann launched a secret effort to undermine them because Plaintiffs objected to their "reckless desire to entrust Cherry [Oil] to Jason." (*Id.* at ¶ 56.)   The Amended Complaint sets out numerous examples of "misconduct," "failure to exercise good faith, care, and diligence," and "mismanagement" relating to Jay and Ann's performance of their duties with regard to Cherry Oil. (*Id.* at ¶¶ 57–64.)

9.      For example, the Amended Complaint includes allegations that: Ann referred to Armistead as "scary," "crazy," a "bully," and a "monster" to other Cherry Oil employees (*Id.* at ¶ 57(a)); Jay and Jason "frustrated a critical employee to the point that he quit so that Jason could assume his position" (*Id.* at ¶ 57(b)); Jay and Ann made modifications to the management of Cherry Oil that are "a stark departure from how the business has been run since at least 1995[,]" including

"counterproductive personnel changes," "counterproductive changes in the contact points," and "counterproductive deviations from agreed operational processes and initiatives" (*Id*. at ¶¶ 57(d)(i)–(iii)); Jay and Ann "[a]llow[ed] Jason to take charge of areas under Armistead's longstanding areas of responsibility" and "actively work[ed] to frustrate initiatives Armistead brought to Cherry Oil" (*Id*. at ¶ 57(d)(vi)); and Jay and Ann have used their positions of power and control to unlawfully "enable and pursue pointless investigations" of Plaintiffs (*Id*. at ¶ 57(f)). Plaintiffs assert that this misconduct by the Cherrys "was a breach of their fiduciary duties and other special duties owed to Armistead, Louise, Cherry Oil, [and] Cherry Energy" and "exemplifies willful gross management and improper self-dealing." (*Id*. at ¶ 58.)

10. On April 9, 2021, Plaintiffs sent a letter to Cherry Oil demanding that it take suitable action with regard to their concerns about the Cherrys' actions. ("Derivative Demand Letter," ECF No. 18.12; *see also* ECF No. 14, at ¶¶ 6–7.) The Derivative Demand Letter detailed much of the same alleged misconduct that is contained in Plaintiffs' pleadings in this action and demanded that Cherry Oil "immediately take all reasonable steps to compel the [Cherrys] to cease their unlawful conduct and obtain appropriate relief from them." (ECF No. 18.12, at p. 4.) The Derivative Demand Letter further stated: "Please respond to this demand as quickly as possible. In the event that [Cherry Oil] fails to meet the demand stated above, the Shareholders may bring litigation on [Cherry Oil's] behalf to force the Prospective Defendants to remedy the harms outlined [in the letter] through monetary damages[.]" (*Id*.)

11.     Before receiving a response to their Derivative Demand Letter, Plaintiffs filed their original complaint in this action in Superior Court, Lenoir County, on May 6, 2021 against Defendants Cherry Oil, Jay, and Ann. The complaint asserted five claims for relief: (1) dissolution of Cherry Oil pursuant to N.C.G.S. § 55-14-30 (ECF No. 3, at ¶¶ 44-66); (2) removal of Jay and Ann as directors under N.C.G.S. § 55-8-09 (*Id*. at ¶¶ 75–81); (3) breach of fiduciary duty and constructive fraud against Jay and Ann (*Id*. at ¶¶ 82–97); (4) breach of contract against Jay (*Id*. at ¶¶ 99–105); and (5) a putative claim for constructive trust against Jay and Ann (*Id*. at ¶¶ 106–111). No derivative claims were asserted at that time.

12.     On June 7, 2021, this action was designated as a mandatory complex business case and assigned to the Honorable Gregory P. McGuire. (Design. Ord., ECF No. 1; Assign. Ord., ECF No. 2.)

13.     Plaintiffs assert that "[a]fter Armistead and Louise filed the [i]nitial Complaint, Jay and Ann intensified and amplified their prior misconduct" in at least four ways: (1) Jay and Ann improperly held a shareholder meeting on June 16, 2021 in an attempt to remove Armistead and Louise from the Board without adhering to procedural requirements set forth in Cherry Oil's bylaws (ECF No. 18, at ¶ 79); (2) Jay and Ann purported to hold a meeting of the "new" Board (composed of Jay, Ann and Armistead) to approve a "call" of Plaintiffs' shares in Cherry Oil (*Id*. at ¶ 82); (3) Jay and Ann hired their own previously retained counsel, Womble Bond Dickinson (US) LLP ("Womble Bond"), to also serve as counsel for Cherry Oil, a course of action to which Armistead and Louise "had previously objected to . . . at least five times" due

to perceived conflicts of interest (*Id*. at ¶ 86); and (4) Jay and Ann further acted so as to exclude Armistead and Louise from their roles at Cherry Oil (*Id*. at ¶ 88).

14. On June 25, 2021, Womble Bond attorneys—who already had appeared on behalf of Jay and Ann—entered an appearance on behalf of Cherry Oil. (ECF Nos. 9, 10.) Simultaneously, the lawyer who had previously entered an appearance for Cherry Oil, Todd Sullivan of Graebe Hanna & Sullivan, PLLC ("GHS"), filed a Motion to Withdraw in which he sought leave from the Court to withdraw as counsel for Cherry Oil. (ECF No. 8, at ¶ 7.) In the Motion to Withdraw, Sullivan represented that GHS's "role in this case was to appear solely for the purpose of protecting the interests of Cherry Oil until such time as Womble [Bond] determined whether it could appropriately represent all Defendants, including Cherry Oil." (*Id*. at ¶ 2.)

15. On July 1, 2021, this action was reassigned to the undersigned. (Reassign. Ord., ECF No. 11.)

16. On July 2, 2021, Plaintiffs filed a Motion to Disqualify in which they asked the Court to rule that Womble Bond was not permitted to serve as counsel for Cherry Oil in this action. (ECF No. 12.) In this motion, Plaintiffs further requested that the Court disqualify Womble Bond from representing *any* Defendant in this case "[a]bsent Womble Bond showing that (i) it was retained by Cherry Oil after June 18, 2021 <u>and</u> (ii) it has not improperly received or withheld Cherry Oil information[.]" (*Id*.)

17. On July 8, 2021, Womble Bond—on behalf of Cherry Oil—sent Plaintiffs a response to the Derivative Demand Letter stating that Plaintiffs' filing of the initial

Complaint—which included facts and allegations largely duplicative of the allegations in the Derivative Demand Letter—was improperly brought prior to the expiration of the ninety-day waiting period required by N.C.G.S. § 55-7-42(2).[5] (ECF No. 18.13.) The letter concluded by stating that "after consultation with our client, [Cherry Oil] has determined that the demand was improperly made. We hereby demand the action be withdrawn consistent with the terms of N.C.[G.S.] § 55-7-42." (*Id.*)

18. On July 19, 2021, Plaintiffs filed an Amended Complaint, adding derivative claims against Jay and Ann for gross negligence/willful misconduct (ECF No. 18, at ¶¶ 139–42); breach of fiduciary duty (*Id.* at ¶¶ 143–46); constructive fraud (*Id.* at ¶¶ 147–50); and a claim seeking the removal of Jay and Ann as Directors under N.C.G.S. § 55-8-09 (*Id.* at ¶¶ 151–56).

19. The Court held a hearing on the Motion to Disqualify and the Motion to Withdraw on August 11, 2021. (ECF No. 23.) The Motions are now ripe for decision.

### LEGAL STANDARD

20. Our Supreme Court has articulated the following standard regarding motions for disqualification of counsel:

> "Decisions regarding whether to disqualify counsel are within the discretion of the trial judge," *Travco Hotels, Inc. v. Piedmont Nat. Gas Co.*, 332 N.C. 288, 295, 420 S.E.2d 426, 430 (1992), but a trial court's exercise of discretion is

---

[5] Section 55-7-42 of the North Carolina Business Corporation Act states that "No shareholder may commence a derivative proceeding until: (1) A written demand has been made upon the corporation to take suitable action; and (2) *90 days have expired from the date the demand was made* unless, prior to the expiration of the 90 days, the shareholder was notified that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period. N.C.G.S. § 55-7-42 (emphasis added).

subject to reversal when the court orders disqualification based on a misunderstanding of the law, *see In re Estate of Skinner*, 370 N.C. 126, 138, 804 S.E.2d 449, 457 (2017); s*ee also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461, 110 L. Ed. 2d 359, 382 (1990) (noting that the "[trial] court would necessarily abuse its discretion [in deciding a Rule 11 motion] if it based its ruling on an erroneous view of the law").

*Worley v. Moore*, 370 N.C. 358, 363–64 (2017).

21. "[T]he drastic nature of disqualification requires that courts avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel; and that they always remain mindful of the opposing possibility of misuse of disqualification motions for strategic reasons." *Harriott*, 2015 NCBC LEXIS 43, at *8 (quoting *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir. 1992) (citation omitted)).

## ANALYSIS

### A. Motion to Disqualify

22. Plaintiffs contend that Womble Bond's concurrent representation of both Cherry Oil *and* the two individual Defendants (Jay and Ann) creates an irresolvable conflict of interest given that Plaintiffs have brought derivative claims on behalf of Cherry Oil based on allegations of wrongful conduct by the Cherrys that have harmed the corporation.

23. As another court has noted, "[s]uccinctly put, the question is this: Can an attorney render truly impartial advice to the corporate client where the interest of his individual clients will inevitably be affected by the character of the corporation's

response to the suit?" *Stepak ex rel. Southern Co. v. Addison*, 20 F. 3d 398, 404 (11th Cir. 1994) (citation and internal quotation marks omitted).

24. While this Court is, of course, not bound by decisions from other jurisdictions in ruling on an issue of North Carolina law, it is permitted to consider such cases to the extent they are instructive. *See Carolina Power & Light Co. v. Employment Sec. Comm'n of N.C.*, 363 N.C. 562, 569 (2009). The Supreme Court of Texas recently summarized the unique issues that are inherent in derivative actions:

> Shareholder derivative actions provide a procedural pathway for a minority shareholder to sue on behalf of the company for wrongs committed against the company. Because the suit is to vindicate the company's rights, it is often said that the company is a "plaintiff" in a derivative action. Labeling the company a "plaintiff" does not tell the whole story, however. Most companies begin derivative litigation resistant to the minority shareholder's derivative claims. The resistance of the company's usual decisionmakers to the minority shareholder's claims is what causes derivative litigation in the first place. For this reason, in addition to sometimes being called plaintiffs, companies embroiled in derivative litigation are also commonly called "nominal defendants." Thus, companies in derivative litigation are simultaneously "plaintiffs" and "defendants," depending on how you look at it. Of course, if the company is literally both plaintiff and defendant, then no lawyer could ever represent it in derivative litigation because to do so would automatically place the lawyer on both sides of the case. Obviously, that is not the rule.

*In re Murrin Bros. 1885, Ltd.*, 603 S.W.3d 53, 58 (Tex. 2019) (internal citations omitted).

25. Plaintiffs argue that both currently existing conflicts and reasonably foreseeable future conflicts make it impossible for Womble Bond to simultaneously

represent both Cherry Oil and the Cherrys in this action. In essence, Plaintiffs' argument is that an attorney cannot represent one client at the same time that it is investigating that client for potential wrongdoing against another client.

26. In response, Defendants argue that "Plaintiffs . . . are seeking to entice the Court into an entirely mechanical application of the Rules [of Professional Conduct] in a manner designed not to protect their interests, but rather to deprive Defendants of their choice of counsel for purely strategic reasons" and that "Plaintiffs cannot carry the required heavy burden" so as to entitle them to the "drastic remedy of disqualification."

27. At the outset, the Court observes that the issue of whether in a derivative action one law firm may concurrently represent both the corporation and the director alleged to have wronged the corporation is one of first impression in North Carolina.

28. Courts in other jurisdictions have employed different tests in addressing this issue. Some courts have concluded that representation by one law firm of both the corporation and its director is categorically impermissible in all but the most frivolous lawsuits. *See, e.g.*, *In re Conduct of Kinsey*, 660 P.2d 660, 669 (Or. 1983) (requiring separate counsel unless the claim is "patently sham or patently frivolous"); *Rowen v. LeMars Mut. Ins. Co. of Iowa*, 230 N.W.2d 905, 914 (Iowa 1975) (holding that the potential for a conflict of interest in this context is so great as to require representation by independent counsel).

29. Other courts have taken a more practical approach, reasoning that the interests of the company and its controlling officers or directors are often aligned and that separate counsel is not necessary unless a divergence of those interests actually arises. *See In re Murrin*, 603 S.W.3d at 59 (declining to create a "categorical rule governing dual representation in derivative litigation" and stating that such cases "require[ ] consideration of the true extent of [the company and the individual defendants'] adversity under the circumstances"); *Marcum v. Scorsone*, 457 S.W.3d 710, 719 (Ky. 2015) (holding that common representation is not, by itself, independent grounds for disqualification in a shareholder derivative suit); *Scattered Corp. v. Chi. Stock Exch., Inc.*, 1997 Del. Ch. LEXIS 50, at *24–25 (Del. Ch. Apr. 7, 1997) (finding that law firm's dual representation of company defendant and individual defendants did not create appearance of impropriety because their interests were the same at that point in the litigation).

30. Perhaps the most common approach by courts has been to require separate counsel in derivative actions only where serious allegations of fraud or self-dealing have been alleged against individual directors or managers. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1316 (3rd Cir. 1993) (holding that disqualification of law firm that concurrently represented corporation and individual manager defendants was not required where there were no allegations of serious wrongdoing); *Vance v. Vance*, 2020 U.S. Dist. LEXIS 168156, at *23 (D. Kan. Sept. 15, 2020) (finding that disqualification of law firm in derivative suit that concurrently represented corporation and director was necessary where allegations involved self-dealing,

intentional misconduct, and fraud); *Averhart v. Communications Workers of Am.*, 2013 U.S. Dist. LEXIS 117698, at *9 (D. N.J. Aug. 20, 2013) (finding disqualification not required in derivative suit where conduct that formed basis of complaint was "akin to mismanagement and not acts of self-dealing, stealing, and fraud that give rise to a conflict of interest"); *Quinn v. Anvil Corp.*, 2008 U.S. Dist. LEXIS 128792, at *4 (W.D. Wash. Aug. 27, 2008) (ordering disqualification where plaintiff alleged "more than simple mismanagement and unintentional breaches of the directors' fiduciary duty of care"); *Ontiveros v. Constable*, 199 Cal. Rptr. 3d 837, 844 (Cal. Ct. App. 2016) (acknowledging that "[c]urrent case law clearly forbids dual representation of a corporation and directors in a shareholder derivative suit, at least where, as here, the directors are alleged to have committed fraud"); *Taneja v. Familymeds Grp., Inc.*, 2010 Conn. Super. LEXIS 1239, at *32 (Conn. Super. Ct. May 18, 2010) (finding that "[b]ecause the complaint alleges that [the individual directors] committed intentional misconduct and fraud, their interests conflict with the corporation's, and therefore, simultaneous representation is not permitted").

31.     Having reviewed the caselaw from other jurisdictions on this issue, the Court must now apply North Carolina law.  Although, as noted above, there are no cases from North Carolina courts addressing the precise question before the Court, the North Carolina Rules of Professional Conduct provide helpful guidance on this issue.

32.     Rule 1.7 addresses conflicts of interest that arise with respect to concurrent representation:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interests exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

N.C. R. Prof. Cond. Rule 1.7.

33. Rule 1.13 addresses an attorney's representation of an organization and provides, in pertinent part, as follows:

(g) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

*Id.* at Rule 1.13(g).

34.     Notably, Comments 13 and 14 to Rule 1.13 expressly address conflicts of interest regarding dual representation in the context of derivative actions and state in relevant part as follows:

> Derivative Actions
>
> [13] Under generally prevailing law, the shareholders or members of a corporation may bring suit to compel the directors to perform their legal obligations in the supervision of the organization. . . . Such an action may be brought nominally by the organization, but usually is, in fact, a legal controversy over management of the organization.
>
> [14] The question can arise whether counsel for the organization may defend such an action. The proposition that the organization is the lawyer's client does not alone resolve the issue. Most derivative actions are a normal incident of an organization's affairs, to be defended by the organization's lawyer like any other suit. *However, if the claim involves serious charges of wrongdoing by those in control of the organization, a conflict may arise between the lawyer's duty to the organization and the lawyer's relationship with the board.* In those circumstances, Rule 1.7 governs who should represent the directors and the organization.

*Id.* at Comments 13–14 (emphasis added).

35.     The above-quoted Comments to Rule 1.13 make clear that the Rules of Professional Conduct do not serve as a categorical bar to dual representation in the derivative action context. Indeed, Comment 14 implicitly suggests that in some derivative actions such dual representation of the organization and its directors *can*

be permissible—that is, in cases where "serious charges of wrongdoing" have not been alleged against those directors.

36. North Carolina courts have not previously had the occasion to define what qualifies as "serious charges of wrongdoing" for purposes of Comment 14 to Rule 1.13. Thus, the Court finds it instructive to look for guidance to case law from other jurisdictions whose ethical rules for attorneys articulate this same standard. A review of such cases reveals that in identifying serious charges of wrongdoing, courts have typically relied upon allegations of misconduct by those in control of the organization amounting to fraud, theft, self-dealing, or usurpation of corporate opportunities. *See Vance*, 2020 U.S. Dist. LEXIS 168156, at *29 (finding that allegations surrounding multi-million dollar sale of defendant director's business to the corporation "involve serious allegations of self-dealing" and, therefore, qualify as serious charges of wrongdoing); *Best v. R & R Real Estate Investors*, 2018 U.S. Dist. LEXIS 233586, at *22 (D. Iowa June 12, 2018) (finding allegations of managing member's wrongful impairment of LLC's assets, misleading accounting records, efforts to thwart good-faith discussions about severing the parties' relationship and preserving the value of the LLC, and usurpation of corporate opportunities sufficient to constitute serious charges of wrongdoing); *Quinn*, 2008 U.S. Dist. LEXIS 128792, at *4 (finding allegations that defendants "intentionally and knowingly misstated the fair market value of [the corporation's] stock so that they could acquire stock options at an undervalued strike price" qualified as a serious charge of wrongdoing); *Taneja*, 2010 Conn. Super. LEXIS 1239, at *25–27 (finding allegations of defendant directors'

"wast[ing] [of] $80 million in corporate assets through self-dealing"; "unjustifiably extravagant severance packages"; and refusal of two "bona fide offers to sell the corporation with the intent of lowering the stock price" in order to "obtain the corporation's assets at a fraction of their former value" to be serious charges of wrongdoing).

37. Conversely, courts applying this same standard have declined to find that serious charges of wrongdoing had been asserted where the allegations of misconduct merely involved mismanagement or a breach of the duty of care. *See, e.g., Bell Atl. Corp.*, 2 F.3d at 1316 (finding no serious charges of wrongdoing where "plaintiffs have alleged only mismanagement, a breach of the fiduciary *duty of care*" and not "allegations of self-dealing, stealing, fraud, intentional misconduct, conflicts of interest, or usurpation of corporate opportunities by defendant directors"); *Averhart*, 2013 U.S. Dist LEXIS 117698, at *9–10 (finding no serious charges of wrongdoing where plaintiffs' claims alleged violations of a union's constitution and bylaws rather than self-dealing, theft, or fraud).

38. In the present case, based on a careful reading of the Amended Complaint, the Court is not persuaded that the allegations contained therein assert "serious charges of wrongdoing" against Jay and Ann as directors of Cherry Oil. Instead, the allegations primarily represent a disagreement with the way the company is currently being run and a concern that Plaintiffs' role in the corporation is being improperly diminished. For example, the allegations of misconduct alleged in the Amended Complaint against the Cherrys include, among other things: the

undermining and antagonizing of Plaintiffs in a juvenile manner; managing the company in a way that is a "stark departure from how the business has been run since at least 1995"; the "unilateral, counterproductive" changes to personnel, contact points, and operational processes; the unwarranted investigations into the conduct of Plaintiffs; and allowing Jason to take charge of areas for which Armistead previously had responsibility. In essence, these allegations reveal a bitter family dispute over the current management and future direction of a family business that—in the eyes of Plaintiffs—has resulted (and will continue to result) in damage to Cherry Oil. But Plaintiffs' Amended Complaint is devoid of the sort of allegations of theft, fraud, or gross financial conflicts of interest that courts have found sufficient to constitute serious charges of wrongdoing.

39. Although the Amended Complaint uses the term "self-dealing" on a number of occasions in its characterization of the Cherrys' conduct (*see, e.g.*, ECF No. 3, at ¶¶ 58, 87, 89), the supporting allegations reveal that they are not alleging actual self-dealing in its traditional sense. *See Self-Dealing*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "self-dealing" as "[p]articipation in a transaction that benefits oneself instead of another who is owed a fiduciary duty. For example, a corporate director might engage in self-dealing by participating in a competing business to the corporation's detriment"). Rather, Plaintiffs allege "self-dealing" on the part of Jay and Ann in the sense that they have acted so as to consolidate their power over Cherry Oil and, in doing so, have lessened Plaintiffs' ability to provide input into the company's management. The Court is of the view that such allegations do not amount

to the type of corporate "self-dealing" that would make dual representation of Cherry Oil and the Cherrys impossible. *Cf., Vernon v. Cuomo*, 2009 NCBC LEXIS 1, at **37–38 (N.C. Super. Ct. March 17, 2009) (finding transactions involving a corporation in which its directors had a direct or indirect interest to constitute "self-dealing" where "none of the transactions were authorized, ratified, or approved by a majority of disinterested directors"; the material facts were "deliberately hidden from the minority shareholders"; the "transaction was not fair to the corporation"; and the "directors clearly received a personal financial benefit from the transactions they approved").

40.     Accordingly, having applied the legal principles discussed above to the facts of this case while remaining mindful of the drastic nature of disqualification, the Court is unable to conclude on the present record that Plaintiffs have met their steep burden of showing that disqualification of Womble Bond is required. Therefore, the Motion to Disqualify is DENIED.[6]

**B. Motion to Withdraw**

41.     In light of the Court's denial of Plaintiffs' Motion to Disqualify, the Court CONCLUDES that GHS's Motion to Withdraw should be GRANTED, and GHS is hereby released and discharged from further representation of Cherry Oil in this matter.

---

[6] Womble Bond, of course, remains obligated to fully comply with the Rules of Professional Conduct and to take appropriate steps should a conflict arise in connection with its representation of Defendants during the remainder of this litigation.

## C. Lifting of Stay

42.    On August 11, 2021, the Court entered an Order staying the deadline for Defendants to respond to Plaintiffs' Amended Complaint pending the Court's ruling on the pending motions. (ECF No. 26.)  The stay is hereby LIFTED, and Defendants shall have twenty (20) days from the date of this Order in which to file an answer or other response to the Amended Complaint.

### CONCLUSION

THEREFORE, IT IS ORDERED as follows:

1. Plaintiffs' Motion to Disqualify is **DENIED**.

2. GHS's Motion to Withdraw is **GRANTED**.

3. The stay previously entered by the Court is **LIFTED,** and Defendants shall have twenty (20) days from the date of this Order in which to file an answer or other response to the Amended Complaint.

SO ORDERED, this the 20th day of September, 2021.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases